[No. S115008. Dec. 6, 2004.]

STEVE GATES, Plaintiff and Respondent, v.
DISCOVERY COMMUNICATIONS, INC., et al., Defendants and
Appellants.

## COUNSEL

Leopold, Petrich & Smith, Louis P. Petrich and Robert S. Gutierrez for Defendants and Appellants.

McDermott Will & Emery, Robert H. Rotstein and Nicholas F. Oettinger for the Motion Picture Association of America, Inc., as Amicus Curiae on behalf of Defendants and Appellants.

Davis Wright Tremaine, Gary L. Bostwick, Kelli L. Sager and Marc A. Fuller for CBS Broadcasting, Inc., The Copley Press, Inc., The McClatchy Company, Los Angeles Times Communications LLC, Bloomberg L.P., the First Amendment Project, the California Newspaper Publishers Association, the Northern California Chapter of the Society of Professional Journalists and the California First Amendment Coalition as Amici Curiae on behalf of Defendants and Appellants.

Niles R. Sharif for Plaintiff and Respondent.

## OPINION

**WERDEGAR, J.—** ██ We must decide whether the producers and presenters of a television documentary program may be held liable in tort for publishing therein information they gathered from public official court records concerning a person who many years previously served a prison term for a felony conviction but who has since lived an obscure, lawful life and become a respected member of the community. The Court of Appeal concluded defendants may not be held liable under such circumstances. We affirm the judgment of the Court of Appeal.

### Background

Plaintiff served a prison sentence of three years (with time off for good behavior) that was imposed after he was convicted upon pleading guilty in 1992 to being an accessory after the fact to a murder for hire that occurred in 1988. The victim was an automobile salesman who was shot and killed by

hired "hitmen" at the door of his Southern California home. A prominent automobile dealer was convicted of masterminding the murder in order to deter a class action lawsuit the victim had filed against an automobile dealership owned by the dealer's parents. Plaintiff, who was employed as the automobile dealer's assistant manager at the time of the murder, originally was charged as a coconspirator, but the charges were later reduced. Defendants are television production and transmission companies that aired an account of the crime in 2001—more than a dozen years after the crime occurred.

After defendants' documentary was broadcast, plaintiff filed this action, pleading causes of action for defamation and invasion of privacy. With respect to his defamation claim, plaintiff alleged that since he was released from prison he has a led an obscure, productive, lawful life.[1] He further alleged that defendants' program falsely portrayed him as being involved in a conspiracy to murder, falsely depicted him as participating in a telephone wiretap to develop evidence, and falsely suggested he was a self-confessed murderer. With respect to his invasion of privacy cause of action, plaintiff alleged he was damaged by "the revelation that Plaintiff pleaded guilty to being an accessory after the fact to a murder for hire plot and the airing by Defendants of Plaintiff's photograph."

Defendants demurred to both causes of action, contending plaintiff was a limited-purpose public figure and could not demonstrate that defendants had made any defamatory statements with malice. Defendants also filed a special motion to strike the invasion of privacy claim under Code of Civil Procedure section 425.16 (section 425.16), the anti-SLAPP[2] statute.

Stating that "the gist or sting of [defendants'] report was accurate," the trial court sustained without leave to amend defendants' demurrer to the defamation cause of action. On the ground that "there is no authority which precludes civil liability for truthful publication of private facts regardless of whether the information is newsworthy," however, the court overruled the demurrer to the invasion of privacy cause of action. The court also denied defendants' anti-SLAPP motion as to the invasion of privacy cause of action, concluding that plaintiff had demonstrated a likelihood of prevailing thereon. (See § 425.16, subd. (b)(1).)

---

[1] Plaintiff's request that we judicially notice a certificate of rehabilitation he obtained from the San Bernardino Superior Court is granted. (Evid. Code, §§ 459, subd. (a), 452, subd. (d); *Brosterhous v. State Bar* (1995) 12 Cal.4th 315, 325 [48 Cal.Rptr.2d 87, 906 P.2d 1242]; *Mangini v. R. J. Reynolds Tobacco Co.* (1944) 7 Cal.4th 1057, 1063 [31 Cal.Rptr.2d 358, 875 P.2d 73].)

[2] Strategic lawsuit against public participation.

Defendants appealed from the order denying the anti-SLAPP motion. (§ 425.16, subd. (j).) The Court of Appeal reversed, relying primarily on *Cox Broadcasting Corporation v. Cohn* (1975) 420 U.S. 469 [43 L.Ed.2d 328, 95 S.Ct. 1029], wherein the United States Supreme Court held that the State of Georgia could not constitutionally sanction a television station for publishing the identity of a deceased 17-year-old rape victim whose name the station's reporter had obtained by examining public court records. (*Id.* at pp. 494–495.) The Court of Appeal held that, as a matter of law, plaintiff could not prevail on his invasion of privacy cause of action because defendants' disclosures were of truthful information contained in the public official records of a judicial proceeding and were, accordingly, protected under the First Amendment to the United States Constitution, as construed by the high court in *Cox*. We granted review.[3]

## Discussion

The question presented is whether the trial court erred in concluding that plaintiff is likely to prevail on his cause of action for invasion of privacy. Plaintiff bases the cause of action on *Briscoe v. Reader's Digest Association, Inc.* (1971) 4 Cal.3d 529 [93 Cal.Rptr. 866, 483 P.2d 34] (*Briscoe*), wherein we held that actionable invasion of privacy may occur through the reckless, offensive, injurious publication of true, but not newsworthy, information concerning the criminal past of a rehabilitated convict. (*Id.* at p. 543.) Defendants argue that *Briscoe* has been overruled by subsequent high court decisions, at least with respect to information a publisher obtains from public (i.e., not sealed) official records of judicial proceedings. For the following reasons, we agree with defendants.

*Briscoe* involved an action for invasion of privacy brought against a magazine publisher. The dispute arose when the defendant published an article disclosing that the plaintiff had committed a truck hijacking 11 years previously. The plaintiff alleged that his friends and his 11-year-old daughter, after learning for the first time from the defendant's article these true but embarrassing facts about his past life, had scorned and abandoned him. Conceding the truth of the disclosures, the plaintiff nevertheless contended that because the offense had occurred many years earlier and he had subsequently led a lawful, obscure life and achieved a place in respectable society, the use of his name in the defendant's article was not "newsworthy" and constituted therefore a tortious invasion of his privacy. (*Briscoe, supra,* 4 Cal.3d at p. 533.)

---

[3] Defendants' "Motion to Strike Petitioner's Opening Brief" is denied. (Cal. Rules of Court, rule 29.1(a)(1), (4).)

In a unanimous opinion authored by Justice Peters, we held the plaintiff had stated a cause of action. (*Briscoe, supra*, 4 Cal.3d at p. 543.) In reaching that conclusion, we traced the concept of the legal right to privacy from the seminal law review article by Warren and Brandeis, *The Right to Privacy* (1890) 4 Harv. L.Rev. 193. We noted that acceptance of the privacy right "has grown with the increasing capacity of the mass media and electronic devices with their capacity to destroy an individual's anonymity, intrude upon his most intimate activities, and expose his most personal characteristics to public gaze." (*Briscoe, supra*, at p. 533.) Recognizing "the potential conflict between freedom of the press and the right of privacy" (*id.* at p. 534), we distinguished between reports of " 'hot news,' items of possible immediate public concern or interest" (*id.* at p. 535) that are "[p]articularly deserving of First Amendment protection" (*ibid.*), and "reports of the facts of *past* crimes and the identification of *past* offenders" with respect to which "reports of the facts . . . are newsworthy" but "identification of the *actor* . . . usually serves little independent public purpose" (*id.* at p. 537). Noting the state's interest in the integrity of the rehabilitative process (*id.* at p. 538), we observed that even "the great general interest in an unfettered press may be outweighed at times" by the interest in affording an "opportunity for all but the most infamous [former criminals] to begin a new life" (*id.* at p. 540). Accordingly, we reasoned, a truthful publication is protected only if it is newsworthy and does not reveal facts so offensive as to shock the community's notion of decency. (*Id.* at p. 541.) We also discussed factors for determining whether an incident is newsworthy: " '[1] the social value of the facts published, [2] the depth of the article's intrusion into ostensibly private affairs, and [3] the extent to which the party voluntarily acceded to a position of public notoriety.' " (*Ibid.*)

Applying the foregoing, we concluded in *Briscoe* that "a jury could reasonably find that plaintiff's identity as a former hijacker was not newsworthy" (*Briscoe, supra*, 4 Cal.3d at p. 541), that "revealing one's criminal past for all to see is grossly offensive to most people in America" (*id.* at p. 542), and that the plaintiff had not voluntarily consented to the publicity accorded him. Therefore, we held, the plaintiff had stated a valid cause of action. (*Ibid.*)

Pursuant to *Briscoe, supra*, 4 Cal.3d 529, plaintiff contends a jury could reasonably find that the fact he long ago pled guilty to being an accessory after the fact to murder is not newsworthy because he is rehabilitated and has lived for over 10 years as an obscure and law-abiding citizen, that revealing the criminal past of someone in his circumstances is offensive to most Americans, and that he did not voluntarily consent to the injurious publicity accorded him. In denying defendants' anti-SLAPP motion, the trial court expressly agreed with plaintiff.

As noted, we granted review in order to determine to what extent, if at all, theories of tort liability paralleling the one we validated in *Briscoe* remain viable.[4] Since *Briscoe* was decided, the United States Supreme Court has issued a number of relevant decisions. The Court of Appeal below accurately described this intervening jurisprudence:

"After *Briscoe* the United States Supreme Court decided a series of cases dealing with the same broad issue of the tension between the right to privacy and the rights of free speech and free press.

"In *Cox Broadcasting Corp. v. Cohn*[, *supra*,] 420 U.S. 469 [43 L.Ed.2d 328, 95 S.Ct. 1029] (*Cox*), a 17-year-old woman was killed during a rape in Georgia. The crime received wide press coverage but the name of the victim was not disclosed because of a Georgia law making it a crime to publish or broadcast such information. A reporter became aware of the name of the victim when shown an indictment in the case made available to him in the courtroom. It was undisputed that the indictment was a public record available for inspection. The reporter's employer broadcast the name of the victim. The victim's father brought a privacy action. Cox argued its broadcast was privileged under the First and Fourteenth Amendments [to the United States Constitution]. The Georgia trial court rejected the argument, stating the Georgia statute gave a civil remedy to those injured by its violation. (*Cox, supra*, 420 U.S. at pp. 471–474.)

"The Supreme Court stated the issue was whether consistent with the First and Fourteenth Amendments 'a State may extend a cause of action for damages for invasion of privacy caused by the publication of the name of a deceased rape victim which was publicly revealed in connection with the prosecution of the crime.' (*Cox, supra*, 420 U.S. at p. 471.)

"The court first acknowledged a growing body of law recognizing a right to privacy. Cox argued the press could not be held criminally or civilly liable for publishing information that was neither false nor misleading. The court noted that in defamation actions truth was generally viewed as a defense. The court stated, however, it had 'carefully' left open the question of whether the Constitution required that truth be recognized as a defense in a defamation action brought by a private person rather than a public figure. The court stated the same degree of caution should exist in dealing with the issue of the effect of truth on the tort of invasion of privacy. (*Cox, supra*, 420 U.S. at pp. 489–491.)

---

[4] Since, as will appear, we conclude that such theories do *not* remain viable (and therefore that plaintiff as a matter of law may not prevail), we have no occasion to address whether such causes of action are, as plaintiff disputes, subject in the first instance to a special motion to strike under the anti-SLAPP statute (§ 425.16, subd. (b)) or whether, as defendants assert, plaintiff failed to preserve that issue.

"In this regard, the court stated: 'Rather than address the broader question whether truthful publications may ever be subjected to civil or criminal liability consistently with the First and Fourteenth Amendments, or to put it another way, whether the State may ever define and protect an area of privacy free from unwanted publicity in the press, it is appropriate to focus on the narrower interface between the press and privacy that this case presents, namely, whether the State may impose sanctions on the accurate publication of the name of a rape victim obtained from the public records—more specifically, from judicial records which are maintained in connection with a public prosecution and which themselves are open to public inspection. We are convinced that the State may not do so.' (*Cox, supra,* 420 U.S. at p. 491.)

■ "The court explained that the reporting of information concerning the operation of every part of government, including the judiciary, was of great importance and entitled to strong protection. The court noted that the law of privacy recognized that the interest in privacy fades when the information involved was already in the public record. (*Cox, supra,* 420 U.S. at pp. 494–495.)

■ "The court emphasized that by putting information in an official court record, the state must presume that the public interest was being served. It stated that public records by their very nature are of interest to the public and an important benefit is performed when they are published. The court stated such reporting was important to our form of government and then concluded: 'In preserving that form of government the First and Fourteenth Amendments command nothing less than that the States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection.' (*Cox, supra,* 420 U.S. at p. 495.)

"The court stated it was reluctant to embark on a course that would make public records available to the press but forbid their publication if offensive to the sensibilities of some supposed reasonable man. The court stated this would make it difficult for the press to report public business and also stay within the law. Such a rule would invite timidity and self-censorship and would lead to the suppression of matters that would otherwise be published. (*Cox, supra,* 420 U.S. at p. 496.)

"In *Okla. Publishing Co. v. District Court* (1975) 430 U.S. 308 [51 L.Ed.2d 355, 97 S.Ct. 1045] (*Oklahoma Publishing*), delinquency charges arising from a murder were brought against an 11-year-old boy. Members of the media were present in the courtroom during the detention hearing and learned the boy's name. The name appeared in newspaper stories and in radio and television broadcasts. At a later closed hearing the trial court entered an order enjoining the press from revealing the boy's name. Oklahoma Publishing's petition for a writ to quash the order was denied by the Oklahoma

Supreme Court on the basis that Oklahoma law required juvenile proceedings be held in private unless ordered open by the trial court. (*Id.* at pp. 308–309.)

"The United States Supreme Court reversed. Citing *Cox* and other cases, it held that the existence of a state statute requiring closed juvenile hearings was irrelevant since members of the press had lawfully been present at a hearing where the boy's name was revealed. The court noted the name was revealed in connection with ' "the prosecution of the crime," [citation], much as the name of the rape victim in [*Cox*] was placed in the public domain.' (*Oklahoma Publishing, supra*, 430 U.S. at p. 311, fn. omitted.) The Supreme Court found the trial court's order unconstitutional. (*Id.* at pp. 311–312.)

"In *Smith v. Daily Mail Publishing Co.* (1979) 443 U.S. 97 [61 L.Ed.2d 399, 99 S.Ct. 2667] (*Daily Mail*), a 15-year-old student was shot and killed by a 14-year-old classmate in West Virginia. Newspaper reporters learned the classmate's name from eyewitnesses to the crime. The assailant's name was published in the newspaper. Indictments were returned, alleging that the publication of the assailant's name violated a West Virginia statute making it a crime to publish the name of any child connected with a juvenile proceeding without court permission. The West Virginia Supreme Court found the statute unconstitutional as a prior restraint on the freedom of the press. (*Id.* at p. 98.)

"The United States Supreme Court stated the issue of whether the West Virginia law was a prior restraint was not determinative. It stated that whether the statute was a prior restraint or a penal sanction for the publication of lawfully obtained truthful information, any justification required a showing that the state's action furthers a state interest of the 'highest order.' The state argued its interest was maintaining the juvenile's anonymity as a means of promoting rehabilitation. The court concluded this was not an interest of the highest order. (*Daily Mail, supra*, 443 U.S. at pp. 101–106.)

"In *The Florida Star v. B.J.F.* (1989) 491 U.S. 524 [105 L.Ed.2d 443, 109 S.Ct. 2603]) (*The Florida Star*), the court again visited the issue of the criminalization of the disclosure of the name of sex crime victims. A Florida statute made it unlawful to publish the name of the victim of a sexual offense. A report of a rape including the name of the victim was inadvertently released to the press by the police department and The Florida Star newspaper printed it. The rape victim sued the newspaper for printing her name in violation of the nondisclosure statute. The trial court found the newspaper negligent per se and a jury awarded the plaintiff $100,000 in damages. (*Id.* at pp. 526–529.)

"The Supreme Court noted the case again raised the issue of the tension between the freedom of the press and the right of individuals to maintain the

privacy of even truthful information. The court noted that while it had addressed this tension in *Cox*, *Oklahoma Publishing* and *Daily Mail*, its approach had been to deal with the discrete factual context of each case and therefore it had not exhaustively considered the issue. (*The Florida Star*, *supra*, 491 U.S. at pp. 530–531.)

"The Florida Star argued that the trilogy of prior cases produced the rule that the press may never be punished civilly or criminally for publishing the truth. The plaintiff countered that in each of the trilogy cases the information published was already in the public record and the privacy interest in those earlier cases was far less profound than in hers. The court concluded that imposing damages on The Florida Star for publishing the plaintiff's name violated the First Amendment. (*The Florida Star*, *supra*, 491 U.S. at pp. 531–532.)

"The court first noted that *Cox*, while superficially similar, was not directly controlling. *Cox* dealt with the publication of the name of a sex crime victim that was already contained in the public record of a judicial proceeding. The court noted *Cox* emphasized the ' "special protected nature of accurate reports of *judicial* proceedings." ' (*The Florida Star*, *supra*, 491 U.S. at p. 532.) The court observed this status existed because of the special role the press plays in subjecting trials to public scrutiny and thus helping to maintain their fairness. The plaintiff's name published by The Florida Star did not come from the public record of a judicial proceeding since there was no such proceeding at the time of publication. (*Ibid.*)

"The court also rejected any rule that truthful publications may never be punished. It noted the court had carefully avoided such a pronouncement, concluding that given the issues involved, it was better to treat situations as they arose and not declare categorical directives. Instead, the court crystallized a flexible rule first suggested in *Daily Mail*, ' "[I]f a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order." [Citation.]' (*The Florida Star*, *supra*, 491 U.S. at pp. 532–534.)

"The court stated such a rule giving great protection to the publication of lawfully obtained truthful information was justified by at least three considerations. First, the government has sufficient means in most cases to sufficiently protect confidential information without punishing its publication. (*The Florida Star*, *supra*, 491 U.S. at p. 534.) Next, it does little to protect the right of privacy to punish the publication of information already available to the public. In this regard, the court stated: 'It is not, of course, always the case that information lawfully acquired by the press is known, or accessible,

to others. But where the government has made certain information publicly available, it is highly anomalous to sanction persons other than the source of its release.' (*Id.* at p. 535.) The court continued: '[I]t is a limited set of cases indeed where, despite the accessibility of the public to certain information, a meaningful public interest is served by restricting its further release by other entities, like the press. As *Daily Mail* observed in its summary of *Oklahoma Publishing*, "once the truthful information was 'publicly revealed' or 'in the public domain' the court could not constitutionally restrain its dissemination." [Citation.]' (*Ibid.*) Finally, the court noted that punishing truthful information lawfully obtained could result in a harmful ' "timidity and self-censorship" ' on the part of the press. (*Ibid.*)

"In finding that allowing damages against The Florida Star for publishing the sex crimes victim's name was unconstitutional, the court addressed the issue of what is a 'public interest of the highest order.' It noted that the plaintiff claimed three interests advanced by Florida's nondisclosure law, the privacy of victims, the physical safety of victims and the encouragement of victims to report offenses. The court found these interests highly significant but, under the facts of the case before it, not of the highest order. The court noted the information was provided to the newspaper by the government, under Florida law the publication amounted to per se negligence and the non-disclosure was underinclusive in that it applied only to ' "instruments of mass communication." ' (*The Florida Star, supra,* 491 U.S. at pp. 536–541.)

"In *Bartnicki v. Vopper* (2001) 532 U.S. 514 [149 L.Ed.2d 787, 121 S.Ct. 1753], the court dealt with the protection, if any, given by the First Amendment to the disclosure of the contents of an illegally intercepted communication. In that case the media was provided and published the contents of illegally intercepted cellular telephone conversations between a teacher's union president and the union's labor negotiator concerning collective bargaining matters. The officials sued various members of the media who published the intercepted communications, noting that such interceptions were illegal under state and federal law and that it was illegal for anyone to disclose the content of such communication who knew or has reason to know it was illegally intercepted. (*Id.* at pp. 518–519.)

"In addressing the issue the court began by assuming that the media defendants were aware the recordings were of illegally intercepted communications and that disclosing their content was illegal. The court also noted that the media defendants lawfully obtained tapes of the conversation even though they knew the information was itself illegally intercepted. The court further found that the content of the tapes was of public concern. (*Bartnicki v. Vopper, supra,* 532 U.S. at pp. 524–525.)

■ "The court noted the rule that absent a need of the highest order a state may not punish the publication by a newspaper of truthful information lawfully obtained. It was argued that the state had two such interests, removing the incentive to intercept conversations and the interest in minimizing harm to persons whose conversations were intercepted. The court stated these interests met the constitutional test with regard to the person who illegally intercepted the conversation. It quickly rejected, however, the argument that an interest in removing the incentive to intercept applied to one who later lawfully obtained and disclosed . . . the information. (*Bartnicki v. Vopper, supra*, 532 U.S. at pp. 529–532.)

"The court stated that the issue of whether the states had a sufficiently high interest in protecting the privacy of those whose conversation was intercepted was a more difficult question. The court noted that allowing the disclosure of such intercepted conversations might have a chilling effect on private speech. The court concluded, however, under the facts before it, criminalizing disclosure of the conversations implicated the core purpose of the First Amendment because it punished the publication of truthful information of public concern. (*Bartnicki v. Vopper, supra*, 532 U.S. at pp. 532–533.)"

■ We conclude that the high court's decision in *Cox* and its subsequent pronouncements in *Oklahoma Publishing, Daily Mail, The Florida Star*, and *Bartnicki* have fatally undermined *Briscoe*'s holding that a media defendant may be held liable in tort for recklessly publishing true but not newsworthy facts concerning a rehabilitated former criminal (see *Briscoe, supra*, 4 Cal.3d at p. 543), insofar as that holding applies to facts obtained from public official court records. As explained, the high court in *Cox* flatly stated that "the States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection" (*Cox, supra*, 420 U.S. at p. 495) and specifically reaffirmed that rule in *Oklahoma Publishing, supra*, 430 U.S. at page 310 ("the press may not be prohibited from 'truthfully publishing information released to the public in official court records' ").[5]
■ On matters of federal constitutional law, of course, we are bound by the decisions of the United States Supreme Court. (*People v. Bradley* (1969) 1 Cal.3d 80, 86 [81 Cal.Rptr. 457, 460 P.2d 129].)

■ It is true that in subsequently articulating the more general principle of which *Cox*'s rule is an instance—viz., that "state officials may not

---

[5] While in *Cox* the high court did not expressly overrule *Briscoe*, it reversed the judgment of the Georgia Supreme Court immediately after noting that that state high court had in its opinion "concurred with" certain statements in *Briscoe* to the effect that the First Amendment to the United States Constitution did not bar the invasion of privacy claim at issue. (*Cox, supra*, 420 U.S. at pp. 475–476, quoting *Briscoe, supra*, 4 Cal.3d at p. 541.)

constitutionally punish publication of [truthful] information" that "a newspaper lawfully obtains . . . about a matter of public significance" (*Daily Mail, supra,* 443 U.S. at p. 103)—the high court excepted circumstances involving "a need to further a state interest of the highest order" (*ibid.*; see also *The Florida Star, supra,* 491 U.S. at p. 533; *Bartnicki v. Vopper, supra,* 532 U.S. at pp. 527–528). But in light of the needs and interests the high court, as previously noted, has determined *not* to be "of the highest order" for these purposes,[6] we conclude, contrary to plaintiff's suggestion, that any state interest in protecting for rehabilitative purposes the long-term anonymity of former convicts falls similarly short.

▉ Plaintiff requests that we distinguish *Cox* and its progeny on their facts, principally the fact that "all of these cases involve situations in which the events reported on occurred within a few days, weeks or months of the offending publication, not years after the fact as in *Briscoe* . . . ." But as the Court of Appeal below recognized, the high court has never suggested, in *Cox* or in any subsequent case, that the fact the public record of a criminal proceeding may have come into existence years previously affects the absolute right of the press to report its contents.[7] *Cox*'s holding was unqualified: "Once true information is disclosed in public court documents open to public inspection, the press cannot be sanctioned for publishing it." (*Cox, supra,* 420 U.S. at p. 496.) *Cox*'s rationale, moreover, related to the "very nature" (*id.* at p. 495) of court records per se, not the age of the particular records at issue in that case. As the high court explained, "[p]ublic records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media." (*Ibid.*; see also *Daily Mail, supra,* 443 U.S. at pp. 103–104; Rest.2d Torts, § 652D, com. d, p. 388 [*Cox*'s language "indicates that this position applies to public records in general"].)

---

[6] See *Daily Mail, supra,* 443 U.S at page 104 (rehabilitative interest in protecting anonymity of juvenile offenders); *The Florida Star, supra,* 491 U.S. at pages 536–541 (interests in crime victim privacy, victim safety and encouraging victims to report offenses); *Bartnicki, supra,* 532 U.S. at pages 529–533 (interests in removing incentive to illegally intercept conversations and in minimizing harm to persons whose conversations are intercepted); *Cox, supra,* 420 U.S. at page 496 (interest in protecting anonymity of deceased rape victim).

[7] As plaintiff points out, the high court, in *Wolston v. Reader's Digest Association, Inc.* (1979) 443 U.S. 157 [61 L.Ed.2d 450, 99 S.Ct. 2701], expressly declined to decide "whether or when an individual who was once a public figure may lose that status by the passage of time" (*id.* at p. 167, fn. 7). *Wolston* is inapposite as the defamation alleged there, an accusation published in a book, was not drawn from public court records. Moreover, the high court's categorical holding in *Cox, supra,* 420 U.S. 469, respecting media freedom to publish the contents of public court records, was not limited to documents concerning public figures. (See *id.* at p. 491.) In following the high court's guidance in *Cox* and its progeny, we have no occasion to address whether plaintiff would be considered a public figure for purposes of an action that is not barred by the rationale of those cases.

We recently had occasion to address invasion of privacy by publication of private facts and, in the course of doing so, made several observations tending to buttress the conclusion that courts are not freed, by the mere passage of time, to impose sanctions on the publication of truthful information that is obtained from public official court records. (See generally *Shulman v. Group W Productions, Inc.* (1998) 18 Cal.4th 200 [74 Cal.Rptr.2d 843, 955 P.2d 469].) As the Court of Appeal below accurately reported:

"Between the decisions in *The Florida Star* and *Bartnicki*, the California Supreme Court addressed the tension between First Amendment speech and press rights and the right to privacy in a context different than that addressed by *Briscoe* or the cited United States Supreme Court cases.

"*Shulman v. Group W Productions, Inc., supra,* 18 Cal.4th 200, involved privacy actions by two automobile accident victims. The rescue of the two and the emergency medical attention given them was videotaped by a production company and was broadcast as part of a television documentary series involving such incidents. The victims sued, raising two causes of action for invasion of privacy: one based on unlawful intrusion and the other based on the public disclosure of private facts during the broadcast. The production company moved for summary judgment, arguing their conduct was protected by the First Amendment since the incident was newsworthy. (*Id.* at pp. 210–212.)

"In dealing with the disclosure of private facts cause of action, the court noted that an element of the tort is that the fact disclosed not be of legitimate public interest, i.e., not newsworthy. The court conducted a detailed review of case authority on the issue. The court noted that the issue of newsworthiness had not been given extensive attention by the United States Supreme Court. The court reviewed *Cox* and *The Florida Star* but noted they did not provide broad guidance on the issue of privacy and in particular not on the issue of newsworthiness. The court emphasized those cases dealt with public records made available to the press. (*Shulman v. Group W Productions, Inc., supra,* 18 Cal.4th at pp. 214–218.)

"The court conducted a detailed analysis of the jurisprudential issues involved and California case authority on the matter. As part of that review the court summarized its decision in *Briscoe* and noted its conclusion that while the facts of Briscoe's 11-year-old crime remained newsworthy, identification of him as the criminal did not. The court reviewed the factors that led to its conclusion and the balancing of interests approach that led to that conclusion. (*Shulman v. Group W Productions, Inc., supra,* 18 Cal.4th at pp. 221–222.)

"The court [in *Shulman v. Group W Productions, Inc. (Shulman)*] concluded that the subject matter of the broadcast as a whole was of legitimate public concern. The court stated the more difficult question was the newsworthiness of images of the victims being rescued and treated. The court found such images newsworthy as a matter of law."

■ While our narrow holding in *Shulman* about the publication of private facts tort—viz., that the plaintiffs there were required, but failed, to demonstrate that the facts published about them were not newsworthy (*Shulman, supra,* 18 Cal.4th at pp. 215, 229–230)—has no direct application here, certain observations we made in the course of reaching that conclusion bear on the question presented. Most specifically, we noted in *Shulman* that the high court's decisions since *Briscoe* "establish that truthful reporting on current judicial proceedings, using material drawn from public records, is generally within the scope of constitutional protection." (*Shulman, supra,* at p. 218.) And while we had no occasion in *Shulman* to consider whether truthful reporting on *past* judicial proceedings might also be protected, we identified as central to the high court's relevant jurisprudence several considerations that neither logically nor practically lend themselves to temporal limitation.

■ Thus, we noted in *Shulman* that the high court's core concern in *Cox* was "the 'responsibility of the press to report the operations of government' . . . including judicial proceedings regarding crimes" (*Shulman, supra,* 18 Cal.4th at p. 217). We also noted *Cox*'s "premise that '[b]y placing the information in the public domain on official court records, the State must be presumed to have concluded that the public interest was thereby being served' " (*Shulman, supra,* at p. 217, quoting *Cox, supra,* 420 U.S. at p. 491). Finally, we noted that the high court's decision in *The Florida Star* "rested in large part on the fact that the government had, by making the information available to the press, impliedly determined its dissemination was in the public interest, and could not then [fairly] punish a newspaper for" relying on that determination. (*Shulman, supra,* at p. 218, citing *The Florida Star, supra,* 491 U.S. at p. 536.)

■ Neither that defendants' documentary was of an historical nature nor that it involved "reenactments," rather than firsthand coverage, of the events reported, diminishes any constitutional protection it enjoys. "[T]he constitutional guarantees of freedom of expression apply with equal force to the publication whether it be a news report or an entertainment feature." (*Gill v. Hearst Publishing Co.* (1953) 40 Cal.2d 224, 229 [253 P.2d 441].) And, as the high court of a sister state recently observed in deciding a similar privacy case, "[t]here is no indication that the First Amendment provides less protection to historians than to those reporting current events." (*Uranga v.*

*Federated Publs., Inc.* (2003) 138 Idaho 550, 556 [67 P.3d 29, 35]; see also *id.* at pp. 556–557 [citing *Cox* in holding that the First and Fourteenth Amendments to the United States Constitution "do not permit" a newspaper "to be held liable in damages for accurately publishing a document contained in a court record open to the public" for over 40 years].)

For the foregoing reasons, we decline to distinguish *Cox* in the manner plaintiff advocates. We, like the high court, are "reluctant to embark on a course that would make public records generally available to the media but forbid their publication if offensive to the sensibilities of the supposed reasonable man. Such a rule would make it very difficult for the media to inform citizens about the public business and yet stay within the law. The rule would invite timidity and self-censorship and very likely lead to the suppression of many items that would otherwise be published and that should be made available to the public." (*Cox, supra*, 420 U.S. at p. 496.)

█ Accordingly, following *Cox* and its progeny, we conclude that an invasion of privacy claim based on allegations of harm caused by a media defendant's publication of facts obtained from public official records of a criminal proceeding is barred by the First Amendment to the United States Constitution. (*Cox, supra*, 420 U.S. at p. 495; *Oklahoma Publishing, supra*, 430 U.S. at p. 311; see also *Daily Mail, supra*, 443 U.S. at p. 103; *The Florida Star, supra*, 491 U.S. at p. 533; *Bartnicki, supra*, 532 U.S. at pp. 527–528.) The complaint states: "The basis for Plaintiff's invasion of privacy claim is the revelation that Plaintiff pleaded guilty to being an accessory after the fact to a murder for hire plot and the airing by Defendants of Plaintiff's photograph." Both that fact and the photograph appear in the public official records relating to plaintiff's 1992 arrest and conviction.[8] Therefore, plaintiff's invasion of privacy claim based thereon is barred.

It follows that defendants' anti-SLAPP motion should have been granted, because, as a matter of law, plaintiff cannot prevail on his invasion of privacy claim. The trial court erred insofar as it concluded to the contrary.

---

[8] Accordingly, we have no occasion to consider the extent to which invasion of privacy claims based on publication of *non*record facts linking the plaintiff to a past crime, or on facts obtained from *non*public records, remain viable. (See *Cox, supra*, 420 U.S. at p. 496 [if "there are privacy interests to be protected in judicial proceedings, the States must respond by means which avoid public documentation"]; Rest.2d Torts, § 652D, com. k, p. 393 ["Although lapse of time may not impair the authority to give publicity to a public record, the pointing out of the present location and identity of the individual raises quite a different problem"].)

## Disposition

The judgment of the Court of Appeal is affirmed.[9]

George, C. J., Kennard, J., Baxter, J., Chin, J., Brown, J., and Moreno, J., concurred.

---

[9] *Briscoe v. Reader's Digest Association, Inc., supra,* 4 Cal.3d 529, is overruled to the extent it conflicts with the views set forth herein.