[No. G046343. Fourth Dist., Div. Three. Mar. 18, 2013.]

MELISSA IGNAT, Plaintiff and Appellant, v.
YUM! BRANDS, INC., et al., Defendants and Respondents.

**COUNSEL**

John H. Elson for Plaintiff and Appellant.

Ogletree, Deakins, Nash, Smoak & Stewart and Katessa C. Davis for Defendants and Respondents.

OPINION

**BEDSWORTH, Acting P. J.—**

## INTRODUCTION

Appellant Melissa Ignat appeals from a judgment of dismissal after the trial court granted summary judgment in favor of Yum! Brands, Inc., alleged to be Ignat's employer, and Mary Shipma, her immediate supervisor, on Ignat's single cause of action for public disclosure of private facts. The basis of Ignat's suit was Shipma's alleged disclosure to Ignat's coworkers of her bipolar condition.

This is Ignat's second trip to our court. She appealed from a prior dismissal on summary judgment after the trial court refused to consider a late-filed opposition. We sent the case back for a decision on the merits. (*Ignat v. Yum! Brands, Inc.* (Mar. 1, 2011, G043098) [nonpub. opn.].)

That decision took the form of the trial court granting summary judgment on the ground the right of privacy can be violated only by a writing, not by word of mouth.[1] Because Ignat had not produced any *document* disclosing private facts, she could not pursue this cause of action. The trial court lamented the "irrationality" of this rule, but felt itself bound by precedent.

We believe this rule—to the extent it is still observed—is outmoded and interferes with a person's right to privacy without any corresponding benefit to any other right or policy. Other restrictions on liability for invasion of privacy serve other important interests, such as free speech or freedom of the press. But no one has come up with a good reason for restricting liability to written disclosures, and it has long been acknowledged that oral disclosures can be just as harmful.

 Because the lack of a writing was the sole basis for the trial court's grant of summary judgment, we reverse. We express only one opinion about the other issues raised in respondents' motion.

## FACTS

Yum! Brands is the corporate parent of several fast-food franchises, such as Taco Bell, Pizza Hut, and KFC (formerly known as Kentucky Fried Chicken). Yum employed Ignat between 2005 and 2008 in the Yum real estate title

---

[1] We use "writing" as it is defined in Evidence Code section 250; it includes not only documents but also photographs and films.

department, located in Irvine.[2] She assisted paralegals in the department with securing title to the real estate on which Yum's franchised stores conducted business.

Ignat suffered from bipolar disorder, for which she was being treated with medications. Sometimes these were effective, sometimes not. Side effects of medication adjustments occasionally forced Ignat to miss work.

Ignat alleged that after returning from one such absence in mid-2008, Shipma informed her that Shipma had told everyone in the department Ignat was bipolar. Ignat alleged her coworkers subsequently avoided and shunned her, and one of them asked Shipma if Ignat was likely to "go postal" at work.

Ignat was terminated in early September 2008. She filed suit against Yum! Brands and Shipma on November 12, 2008, alleging one cause of action for invasion of privacy by public disclosure of private facts. Respondents moved for summary judgment or summary adjudication, identifying seven issues, four of which addressed the elements of a cause of action for public disclosure of private facts. These were: (1) Shipma never told the title department about Ignat's disorder; (2) Shipma did not disclose Ignat's disorder in writing; (3) the disclosure was not highly offensive to a reasonable person; and (4) Ignat had already revealed her condition to some people in the department and therefore had no expectation of privacy.

The court held a hearing on the merits of respondents' motion on November 15, 2011. It granted the motion, basing its ruling solely on the lack of a writing disclosing the private facts. The court also addressed Ignat's argument that respondents had violated her state constitutional right to privacy, which did not require a writing. The problem with that argument, the court held, was that Ignat had not pleaded a violation of a constitutional right in her complaint, which defined the scope of the motion for summary judgment. Ignat has appealed from the judgment entered after the motion was granted.

## DISCUSSION

### I. Standard of Review

"A trial court properly grants summary judgment where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law. [Citation.] We review the trial court's decision de novo, considering

---

[2] There is a dispute, about which we express no opinion, over which corporate entity actually employed Ignat. For convenience, we will simply refer to Ignat's employer, whichever entity it was, as Yum.

all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports. [Citation.] In the trial court, once a moving defendant has 'shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established,' the burden shifts to the plaintiff to show the existence of a triable issue; to meet that burden, the plaintiff 'may not rely upon the mere allegations or denials of its pleadings . . . but, instead, shall set forth specific facts showing that a triable issue of material fact exists as to that cause of action . . . .' [Citations.]" (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476–477 [110 Cal.Rptr.2d 370, 28 P.3d 116].) In the absence of supplemental briefing, we may not affirm a summary judgment on a ground on which the trial court did not rely. (Code Civ. Proc., § 437c, subd. (m)(2).)

## II. *The Common Law Right to Privacy*

As legal lore has it, the first widely recognized call in American law for a right to privacy based on the common law and enforceable in a tort action sounded in an article by Samuel D. Warren and Louis D. Brandeis in the Harvard Law Review of 1890. (Warren & Brandeis, *The Right to Privacy* (1890) 4 Harv. L.Rev. 193 (*The Right to Privacy*).) The authors deplored "[r]ecent inventions and business methods"—namely, advances in photography and the proliferation of newspapers—that "have invaded the sacred precincts of private and domestic life" and "threaten to make good the prediction that 'what is whispered in the closet shall be proclaimed from the house-tops.' "[3] (*The Right to Privacy, supra*, at p. 195.) In light of these new technologies, the established legal protections for individual privacy no longer functioned adequately.[4] The new tort, authorized by "the beautiful capacity for growth which characterizes the common law[,] enabled the judges to afford the requisite protection, without the interposition of the

---

[3] Warren and Brandeis complained that "[t]he press is overstepping in every direction the obvious bounds of propriety and of decency. Gossip is no longer the resource of the idle and of the vicious, but has become a trade, which is pursued with industry as well as effrontery. To satisfy a prurient taste the details of sexual relations are spread broadcast in the columns of the daily papers. To occupy the indolent, column upon column is filled with idle gossip, which can only be procured by intrusion upon the domestic circle." (*The Right to Privacy, supra*, 4 Harv. L.Rev. at p. 196.) Evidently not much has changed in more than a century.

[4] These were (1) existing copyright principles, which prohibited publication of a writing by anyone except its author, and (2) breach of contract or breach of trust, which prohibited publication of photographs or written materials by anyone entrusted, expressly or implicitly, to keep them private. Both of these protections were based on the perception of the writings or other materials as property belonging to the author or to the person who had paid for them. (See *The Right to Privacy, supra*, 4 Harv. L.Rev. at pp. 200–204.)

legislature."[5] (*The Right to Privacy, supra*, at p. 195.) Warren and Brandeis extracted from existing common law protections for property a right personal to an individual, analogous to the right to reputation protected by defamation law. Although they located its origins in the common law, they sought to cut privacy loose from the law of property and to make it a right enforceable on its own.

Warren and Brandeis recognized that the right to privacy must be subject to conditions if it was to coexist with freedom of speech, freedom of the press, and other established areas of law. Accordingly, they proposed limitations on the right. It does not prevent publication of matters of general or public interest (or, as we would say now, "newsworthy" matters). It does not apply to privileged publications, such as court testimony. If the person publishes the facts himself, or consents to their publication, they are no longer private. (*The Right to Privacy, supra*, 4 Harv. L.Rev. at pp. 214–218.)

The authors also speculated that "[t]he law would probably not grant any redress for the invasion of privacy by oral publication in the absence of special damage. [¶] The same reasons exist for distinguishing between oral and written publications of private matters, as is afforded in the law of defamation by the restricted liability for slander as compared with the liability for libel. The injury resulting from such oral communications would ordinarily be so trifling that the law might well, in the interest of free speech, disregard it altogether." (*The Right to Privacy, supra*, 4 Harv. L.Rev. at p. 217, fn. omitted.) They then quoted from an article on privacy published a few months earlier: " 'But as long as gossip was oral, it spread, as regards any one individual, over a very small area, and was confined to the immediate circle of his acquaintances. It did not reach, or but rarely reached, those who knew nothing of him. It did not make his name, or his walk, or his conversation familiar to strangers. And what is more to the purpose, it spared him the pain and mortification of knowing that he was gossipped about. A man seldom heard of oral gossip about him which simply made him ridiculous, or trespassed on his lawful privacy, but made no positive attack upon his reputation. His peace and comfort were, therefore, but slightly affected by it.' " (*Id.* at fn. 4, quoting Godkin, *The Rights of the Citizen: To his Reputation* (July 1890) Scribner's Magazine, p. 66.)

---

[5] The authors became somewhat defensive on the subject of "judicial legislation," stoutly maintaining that "the elasticity of our law, its adaptability to new conditions, the capacity for growth, which has enabled it to meet the wants of an ever changing society and to apply immediate relief for every recognized wrong, have been its greatest boast." (*The Right to Privacy, supra*, 4 Harv. L.Rev. at p. 213, fn. 1.) Not every state court was willing to be so elastic or adaptable. (See, e.g., *Roberson v. The Rochester Folding Box Co.* (1902) 171 N.Y. 538, 556 [64 N.E. 442]; *Henry v. Cherry & Webb* (1909) 30 R.I. 13, 43 [73 A. 97]; *Hillman v. Star Publishing Co.* (1911) 64 Wn. 691, 695 [117 P. 594].)

Seventy years later, Dean William Prosser surveyed the judicial right-to-privacy landscape to see what Warren and Brandeis had wrought. (Prosser, *Privacy* (1960) 48 Cal. L.Rev. 383.) After examining over 300 cases decided after the article appeared, Prosser concluded their right to privacy had headed off in four different directions that shared only the desire to defend a person's right " 'to be let alone.' " (*Id.* at p. 389.) The four torts grouped under this heading were: (1) intrusion upon a person's seclusion or solitude; (2) public disclosure of private facts; (3) publicity that places a person in a false light; and (4) misappropriation of a person's name and likeness. (*Ibid.*)

Prosser identified *Melvin v. Reid* (1931) 112 Cal.App. 285 [297 P. 91] (*Melvin*), as the leading case on public disclosure of private facts at that time. (Prosser, *Privacy, supra*, 48 Cal. L.Rev. at p. 392.) In *Melvin*, a reformed prostitute who had married and led a respectable life for some years became the subject of a 1925 silent movie, The Red Kimono (Blanc de Chine Films 1925), closely based on the lurid details of her former life. Although an actress played her character, the film used her real name. Inexplicably, it appears that the filmmakers also went out of their way to reveal her married name. (*Melvin, supra*, 112 Cal.App. at p. 291.) She sued for invasion of privacy and other causes of action.

Although Prosser may have correctly designated it as the leading private-facts case in 1960, *Melvin* actually did not introduce common law tort liability for public disclosure of private facts into California law. It is easy to see why the opinion lent itself to that interpretation. A large part of the legal analysis dealt with common law privacy cases from other jurisdictions and the general principles about the new tort the court drew from examining these cases. But when it came time for the holding, the *Melvin* court unequivocally refused to base its decision on any newfangled common law tort: "In the absence of any provision of law[,] we would be loath to conclude that the right of privacy as the foundation for an action in tort, in the form known and recognized in other jurisdictions, exists in California." (*Melvin, supra*, 112 Cal.App. at p. 291.) Instead, the court based its decision on the California Constitution as it existed at that time, and specifically on a person's "inalienable right" recognized in the Constitution to "pursue and obtain happiness." (112 Cal.App. at p. 292.)

The rest of the opinion bears out this constitutional focus. The court does not discuss issues that would be germane to a right-of-privacy analysis—for example, whether the plaintiff was a public figure or whether her story was newsworthy. The court instead sermonizes on the duty of society to "lift up and sustain the unfortunate rather than tear him down." (*Melvin, supra*, 112 Cal.App. at p. 292.) Since the plaintiff "had abandoned her life of shame, had rehabilitated herself and had taken her place as a respected and honored

member of society," it was a violation of her constitutional right to pursue and obtain happiness "to throw [her] back into a life of shame or crime. Even the thief on the cross was permitted to repent during the hours of his final agony." (*Ibid.*) The use of her real name "was unnecessary and indelicate and a wilful and wanton disregard of that charity which should . . . keep us from unnecessarily holding another up to the scorn and contempt of upright members of society." (*Melvin, supra,* 112 Cal.App. at p. 291.)

Obviously the court's conception of a right to privacy—based as it is on the right to obtain happiness, on charity, and on the duty to sustain the unfortunate—has little in common with the right to privacy advocated by Warren and Brandeis and recognized in the case law surveyed in *Melvin.* Unlike the two authors, who acknowledged restrictions on the scope of their new common law right, the *Melvin* court set no limits or conditions on the constitutional right.

The entire discussion in *Melvin* of a common law right to privacy, as it was envisioned in the Harvard Law Review article and subsequently put into practice in some jurisdictions, is dictum. The *Melvin* court clearly declined to get on the Warren/Brandeis bandwagon. If the court had adopted the theory advocated by *The Right to Privacy,* the "general principles" it derived from the article and the case law would perhaps have some weight. But the court did not adopt this theory. Its discussion of the principles, while interesting, is irrelevant to its holding.

The general principle that interests us here is the writing requirement. After surveying over 20 cases from other American jurisdictions, the court concluded that "[t]he right of privacy can only be violated by printings, writings, pictures or other permanent publications or reproductions, and not by word of mouth." (*Melvin, supra,* 112 Cal.App. at p. 290.) Two other California cases have followed *Melvin* on this point: *Gautier v. General Telephone Co.* (1965) 234 Cal.App.2d 302, 309 [44 Cal.Rptr. 404], and *Grimes v. Carter* (1966) 241 Cal.App.2d 694, 698–699 [50 Cal.Rptr. 808].

The American cases surveyed in *Melvin* do not support a "general principle" that only written publications can violate the common law right to privacy. None of the cases addresses a distinction between oral and written publication at all. Most of them involve "unauthorized advertising," which we would now categorize under the right of publicity. (See Civ. Code, § 3344.) Three cases involved a right to privacy not dependent on a written publication. In *De May v. Roberts* (1881) 46 Mich. 160 [9 N.W. 146], a woman's right to privacy was violated when a man who was not a doctor assisted her at childbirth. (*Id.,* 9 N.W. at p. 148.) In *Schultz v. Frankfort Marine, Accident & Plate Glass Ins. Co.* (1913) 151 Wis. 537 [139 N.W. 386], a man's right to

privacy was violated when an insurance company employed detectives to follow him into his home and his attorney's office. (*Id.*, 139 N.W. at p. 390.) In *Byfield v. Candler* (1924) 33 Ga.App. 275 [125 S.E. 905], the court held that an unauthorized intrusion into a woman's ship stateroom was actionable as a violation of her right to privacy. (*Id.*, 125 S.E. at p. 906.) None of these cases involved a writing.

The concentration on written publications in the cases cited in *Melvin* appears to be simply an accident of the kinds of privacy violations prevalent at the time.[6] Our forebears evidently had no qualms whatsoever about advertising their goods and services with invented testimonials. (See, e.g., *Foster-Milburn Co. v. Chinn* (1909) 134 Ky. 424 [120 S.W. 364] [forged endorsement for kidney pills]; *Pavesich v. New England Life Ins. Co.* (1905) 122 Ga. 190 [50 S.E. 68] [plaintiff's picture used to advertise life insurance].) As long as the jurisdiction recognized a right to privacy, these abuses could be redressed. But nothing in the cases cited in *Melvin* suggested that *only* written publications could form the basis of a right to privacy claim.

Some cases have credited *Melvin* with establishing the common law right of privacy in California or have listed it among the cases endorsing this right. (See *Katzberg v. Regents of University of California* (2002) 29 Cal.4th 300, 324, fn. 23 [127 Cal.Rptr.2d 482, 58 P.3d 339]; *Briscoe v. Reader's Digest Association, Inc.* (1971) 4 Cal.3d 529, 534 [93 Cal.Rptr. 866, 483 P.2d 34] (*Briscoe*), overruled on other grounds in *Gates v. Discovery Communications, Inc.* (2004) 34 Cal.4th 679, 697, fn. 9 [21 Cal.Rptr.3d 663, 101 P.3d 552]; *Lugosi v. Universal Pictures* (1979) 25 Cal.3d 813, 833, fn. 9 [160 Cal.Rptr. 323, 603 P.2d 425]; *Coverstone v. Davies* (1952) 38 Cal.2d 315, 322–323 [239 P.2d 876]; *Gionfriddo v. Major League Baseball* (2001) 94 Cal.App.4th 400, 408 [114 Cal.Rptr.2d 307]; *Diaz v. Oakland Tribune, Inc.* (1983) 139 Cal.App.3d 118, 125 [188 Cal.Rptr. 762]; *Carlisle v. Fawcett Publications, Inc.* (1962) 201 Cal.App.2d 733, 744 [20 Cal.Rptr. 405]; *Metter v. Los Angeles Examiner* (1939) 35 Cal.App.2d 304, 308–309 [95 P.2d 491] (*Metter*).) Actually, the first California Supreme Court case to endorse the right seems to us to be *Gill v. Curtis Publishing Co.* (1952) 38 Cal.2d 273, 276–278 [239 P.2d 630].[7] *Melvin*, however, specifically declined to do so. (*Melvin, supra*, 112 Cal.App. at p. 291.)

---

[6] A ploy among photographers, which gave rise to several cases, was printing extra pictures from a customer's job and using them for unauthorized purposes. These cases could be dealt with as breaches of contract. (See *Moore v. Rugg* (1890) 44 Minn. 28 [46 N.W. 141]; *Douglas v. Stokes* (1912) 149 Ky. 506 [149 S.W. 849]; *Corliss v. E. W. Walker Co.* (D.Mass. 1893) 57 F. 434, 436; see also *The Right to Privacy, supra*, 4 Harv. L.Rev. at pp. 208–209.)

[7] Before *Gill*, some appellate courts had recognized the right to privacy, but they were somewhat vague as to its source. (See *Stryker v. Republic Pictures Corp.* (1951) 108 Cal.App.2d 191, 194 [238 P.2d 670]; *Bowden v. Spiegel, Inc.* (1950) 96 Cal.App.2d 793, 796 [216 P.2d 571]

■ Although the common law right to privacy appears to have backed into California law, it is now firmly established. (See *Shulman v. Group W Productions, Inc.* (1998) 18 Cal.4th 200, 214 [74 Cal.Rptr.2d 843, 955 P.2d 469] (*Shulman*); *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 23–27 [26 Cal.Rptr.2d 834, 865 P.2d 633] (*Hill*); *Forsher v. Bugliosi* (1980) 26 Cal.3d 792, 808 [163 Cal.Rptr. 628, 608 P.2d 716]; *Briscoe, supra*, 4 Cal.3d at p. 534; *Kapellas v. Kofman* (1969) 1 Cal.3d 20, 34–35 [81 Cal.Rptr. 360, 459 P.2d 912]; *Catsouras v. Department of California Highway Patrol* (2010) 181 Cal.App.4th 856, 900, 903 [104 Cal.Rptr.3d 352]; *Diaz v. Oakland Tribune, Inc., supra*, 139 Cal.App.3d at p. 125.) The question before us, however, is whether the requirement of written publication is as firmly established. Dean Prosser certainly thought it was not. In 1960 he asserted that "the growth of radio alone has [made this rule] obsolete, and there now can be little doubt that [a] writing is not required." (Prosser, *Privacy, supra*, 48 Cal. L.Rev. at p. 394, fn. omitted.) California case law from both before and after 1960 bears out his opinion.

In *Bowden v. Spiegel, Inc., supra*, 96 Cal.App.2d 793, the plaintiff sued for emotional distress after a debt collector telephoned a neighboring family and asked to speak to the plaintiff, falsely telling the neighbors that it was an emergency call. When the plaintiff came to the phone, the collector berated her for not paying a bill, while the neighbor family listened to the plaintiff's side of the conversation. Although the case was decided on emotional distress grounds, the parties also disputed whether the complaint stated a cause of action for violation of the right to privacy, the defendant, of course, maintaining that oral statements cannot support such a cause of action.

While it was unnecessary for the court to decide this issue—having based its holding on emotional distress—the court observed, "The historic article on the subject by Brandeis and Warren . . . suggests this limitation in the absence of special damage . . . and there are dicta in *Melvin* . . . and *Metter* . . . which state the rule baldly without including the exception for the case of special damage. If it were necessary to decide the question we would incline to repudiate this qualification as so broadly stated. The oral dissemination of private matter may be as rapid as the wagging tongue of gossip and as devastating as the printed page; and, to confine the question to the facts in hand, what logical distinction can be found between writing a letter to the [neighbor family] telling them that plaintiff owes defendant a bill and is a deadbeat and summoning her to the telephone before the same family where her spontaneous replies to statements of defendant over the telephone will

[referring to Warren/Brandeis article and dictum in *Melvin*]; *Cohen v. Marx* (1949) 94 Cal.App.2d 704, 705 [211 P.2d 320], disapproved on other grounds in *Johnson v. Harcourt, Brace, Jovanovich, Inc.* (1974) 43 Cal.App.3d 880 [118 Cal.Rptr. 370].)

Another early privacy case, *Metter, supra*, 35 Cal.App.2d at pages 308–312, relied heavily on *Melvin* for its analysis.

naturally disclose to the [neighbors] that she is being dunned for a bill after being summoned from her home at a late hour of the night? It would seem under these circumstances that the oral communication would be more damaging than the written one." (*Bowden v. Spiegel, Inc., supra*, 96 Cal.App.2d at p. 796, citations omitted.)

In *Linehan v. Linehan* (1955) 134 Cal.App.2d 250 [285 P.2d 326], the plaintiff recovered damages for invasion of privacy and defamation from her husband's ex-wife, who repeatedly, and orally, maintained that she was the rightful wife and the plaintiff was living in sin. (*Id.* at pp. 251–252.) The oral nature of the statements had no effect on the cause of action for invasion of privacy.

In *Smith v. National Broadcasting Co.* (1956) 138 Cal.App.2d 807 [292 P.2d 600], the plaintiff claimed his privacy had been violated when NBC broadcast an episode of *Dragnet* (the radio version) based on a police incident in which he was involved. The court held the facts disclosed were not private and the plaintiff had become a public figure, at least with respect to this incident. (*Id.* at pp. 811–812.) Although the court cited *Melvin* several times, the fact the alleged invasion came through an oral radio broadcast, not a written publication, did not figure at all in the analysis.

The court in *H & M Associates v. City of El Centro* (1980) 109 Cal.App.3d 399 [167 Cal.Rptr. 392] based its privacy analysis on the voters' amendment to the California Constitution, which added "privacy" to the inalienable rights of all people. (109 Cal.App.3d at p. 411.) The *Melvin* principle was raised, only to be discarded. After quoting Prosser on its obsolete nature, the court stated, "In this electronic age, where oral statements may ultimately receive wider coverage than a printed statement, there is no reason to immunize parties making such statements from liability. The test should turn on the nature of the privacy invaded and not on the means of communication." (*Id.* at p. 412.)

In *Taus v. Loftus* (2007) 40 Cal.4th 683 [54 Cal.Rptr.3d 775, 151 P.3d 1185], the court discussed whether a disclosure in a speech at a professional conference qualified as public disclosure of private facts. (*Id.* at pp. 706, 715–716, 717–719.) The court determined it did not, because the statements were newsworthy. (*Id.* at pp. 718–719.) Although the court mentioned other potential problems with the cause of action (*id.* at pp. 717–718), the fact that the statements were oral rather than written was not among them. (See *Morrow v. Los Angeles Unified School Dist.* (2007) 149 Cal.App.4th 1424, 1429, 1440 [57 Cal.Rptr.3d 885] [school district sued by principal for oral statements made to press; statements newsworthy].)

To sum up, the "rule" requiring a written publication as an element of a public disclosure of private facts privacy claim in California originated in dictum—which lacked support in the case law on which it was based—in an opinion that rejected the tort and all its principles, instead basing its holding on another principle entirely. It was followed by two cases from the 1960's, both of which cited Melvin's "principle" as if it had been a holding instead of a detour. (*Gautier v. General Telephone Co., supra*, 234 Cal.App.2d at p. 303; *Grimes v. Carter, supra*, 241 Cal.App.2d at pp. 698–699.) With these two exceptions, restricting privacy violations to written publications has been either roundly criticized or ignored by the courts dealing with disclosure of private facts in oral statements since the principle was first enunciated, in dictum, in *Melvin*. This is not a firm foundation for a ruling dismissing a cause of action.

We conclude that limiting liability for public disclosure of private facts to those recorded in a writing is contrary to the tort's purpose, which has been since its inception to allow a person to control the kind of information about himself made available to the public—in essence, to define his public persona. (See *Briscoe, supra*, 4 Cal.3d at p. 534; *The Right to Privacy, supra*, 4 Harv. L.Rev. at pp. 198–199.) While this restriction may have made sense in the 1890's—when no one dreamed of talk radio or confessional television—it certainly makes no sense now. Private facts can be just as widely disclosed—if not more so—through oral media as through written ones. To allow a plaintiff redress for one kind of disclosure but not the other, when both can be equally damaging to privacy, is a rule better suited to an era when the town crier was the principal purveyor of news. It is long past time to discard this outmoded rule.

■ The requirement that a public disclosure be in writing was the only basis for the trial court's ruling on respondents' motion for summary judgment. Accordingly we do not address any other issues raised in the motion or any other potential problems with the cause of action. Our ruling is limited to the necessity for private facts to be disclosed in a writing. We hold that disclosure in a writing is not required to maintain a cause of action for public disclosure of private facts.

## III. *Constitutional Privacy*

Ignat argued to the trial court that her cause of action was based on the guarantee of privacy found in the California Constitution. When the court pointed out that Ignat had failed to allege a cause of action based on the Constitution, Ignat argued that constitutional privacy and common law privacy were, in essence, the same thing, and the distinction was merely a matter of "labels." The court was not persuaded.

Ignat has obliquely alluded to this issue in her opening brief, so we will address it briefly. In a motion for summary judgment, the complaint limits the issues. A plaintiff opposing such a motion cannot defeat it by proffering new, unpleaded theories or issues. (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1257 [78 Cal.Rptr.3d 372]; *Zimmerman, Rosenfeld, Gersh & Leeds LLP v. Larson* (2005) 131 Cal.App.4th 1466, 1489 [33 Cal.Rptr.3d 111].) If constitutional and common law privacy are not the same thing, Ignat cannot oppose respondents' motion by means of this theory.

In *White v. Davis* (1975) 13 Cal.3d 757 [120 Cal.Rptr. 94, 533 P.2d 222], our Supreme Court explored the origins of a constitutional right of privacy. The voters amended the California Constitution in 1972 to include "privacy" among people's "inalienable rights." The court examined the materials presented to the voters during the initiative to determine the amendment's purpose. The materials identified " 'government snooping' " and collecting and stockpiling unnecessary information by government and businesses as the impetus behind the initiative. (*White,* at p. 774.) " 'The proliferation of government and business records over which we have no control limits our ability to control our personal lives.' " (*Ibid.*) The initiative proponents also cited a person's inability to check the accuracy of records of which he is ignorant and the danger of information collected for one purpose being used improperly for another as dangers of snooping, collecting, and stockpiling. (*Id.* at p. 775; see *Hill, supra,* 7 Cal.4th at pp. 16–17, 21.)

The court discussed the intersection of the common law right of privacy with the constitutional variety in *Shulman, supra,* 18 Cal.4th 200. While observing that the two means of protecting privacy "are not unrelated," *Shulman* held the framework developed for resolving constitutional privacy claims was not intended to supplant the common law tort or preclude its independent development. (*Id.* at p. 227.)

■ Our Supreme Court regards the two legal theories as providing separate, albeit related, ways to ensure privacy. The constitutional variety focuses on institutional record keeping and does not require a wide dissemination of private information. (See *Hill, supra,* 7 Cal.4th at pp. 35–37 [elements of constitutional privacy violation].) Liability for the common law tort requires publicity; disclosure to a few people in limited circumstances does not violate the right. (*Porten v. University of San Francisco* (1976) 64 Cal.App.3d 825, 828 [134 Cal.Rptr. 839]; *Timperley v. Chase Collection Service* (1969) 272 Cal.App.2d 697, 700 [77 Cal.Rptr. 782]; *Schwartz v. Thiele* (1966) 242 Cal.App.2d 799, 805 [51 Cal.Rptr. 767].) Moreover, the facts disclosed must be offensive or objectionable to a reasonable person. (See, e.g., *Shulman, supra,* 18 Cal.4th at p. 214.) If they are not, there is no liability. (See, e.g., *Johnson v. Harcourt, Brace, Jovanovich, Inc., supra,* 43

Cal.App.3d at p. 892 [facts disclosed not " 'so offensive as to shock the community's notions of decency.' [Citation.]"]; *Carlisle v. Fawcett Publications, Inc., supra,* 201 Cal.App.2d at p. 748.) The constitutional right, however, may be violated if any private record that was supposed to be kept confidential is disclosed, for example, a college transcript. (*Porten v. University of San Francisco, supra,* 64 Cal.App.3d at p. 827.) In *Long Beach City Employees Assn. v. City of Long Beach* (1986) 41 Cal.3d 937 [227 Cal.Rptr. 90, 719 P.2d 660], the California Supreme Court found involuntary lie detector tests invaded constitutional privacy because they revealed " 'thoughts, sentiments, and emotions' " the test subjects did not want to communicate, regardless of whether the thoughts, sentiments, or emotions were offensive or objectionable. (*Id.* at p. 944.) The mere fact of their forced disclosure was invasive. (*Id.* at pp. 944, 948.)

■ We conclude that alleging a violation of a person's common law right to privacy is not the equivalent of alleging a violation of the constitutional right to privacy. Because Ignat did not allege the latter violation, she was not entitled to have the summary judgment motion evaluated for constitutional privacy. The court properly refused to consider her arguments on this theory of liability.

## DISPOSITION

The judgment of dismissal is reversed. Appellant is to recover her costs on appeal. Because this reversal represents a change in the law upon which the trial court relied, disposition is without prejudice to Yum renewing its motion on any grounds not previously addressed by the court.

Ikola, J., and Thompson, J., concurred.