Filed 4/2/21  Avetisyan v. Drinker Biddle & Reath CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| ANI AVETISYAN, Plaintiff and Appellant, v. DRINKER BIDDLE & REATH LLP, Defendant and Respondent. | B294671 (Los Angeles County Super. Ct. No. BC551859) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Maureen Duffy-Lewis, Judge.  Reversed with directions.

Ani A. Avetisyan, in pro. per., for Plaintiff and Appellant.

Faegre Drinker Biddle & Reath, Alan J. Lazarus and Pascal Benyamini, for Defendant and Respondent.

—————————————

# INTRODUCTION

Ani Avetisyan, an attorney, sued Drinker Biddle & Reath LLP, her former employer, after Drinker Biddle terminated her employment. Avetisyan alleged, among other things, that Drinker Biddle made unsupported criticisms of her work and yet falsely stated that her employment was secure, that the firm would continue to employ her as long as her work was "average," and that the firm would give her six months' notice before terminating her employment.

The trial court sustained without leave to amend Drinker Biddle's demurrer to most of Avetisyan's causes of action, including her various causes of action for breach of contract and her cause of action for promissory estoppel. The court subsequently granted Drinker Biddle's motion for summary adjudication on Avetisyan's remaining causes of action for fraud and negligent misrepresentation, and for summary judgment. Avetisyan appeals, challenging the trial court's rulings on the demurrer and the motion for summary judgment.

We conclude the trial court erred in sustaining the demurrer to Avetisyan's causes of action for breach of oral contract and promissory estoppel, but did not err in sustaining the demurrer to the remaining causes of action. We also conclude the trial court erred in granting the motion for summary adjudication on Avetisyan's cause of action for fraud, but properly granted the motion on the cause of action for negligent misrepresentation. Therefore, we reverse the judgment with directions to reinstate part of this nearly decade-long dispute.

# FACTUAL AND PROCEDURAL BACKGROUND

A. *Avetisyan Begins Working for Drinker Biddle and Receives Mixed Performance Reviews*

Avetisyan accepted an offer of employment from Drinker Biddle in January 2012 and began working in the firm's litigation department the next month. Avetisyan contends her work was "well received" by two Drinker Biddle partners, George Caplan and Kristopher Davis. She admits a third partner, Sheldon Eisenberg, was initially not satisfied with her work, but claims he was impressed with her response to his feedback. Drinker Biddle contends the partners who worked with Avetisyan were concerned about her skills, performance, and ability to advance in the litigation department.

Drinker Biddle arranged a temporary assignment or "secondment" for Avetisyan,[1] where Avetisyan worked for one of Drinker Biddle's clients, under the supervision of Drinker Biddle's data privacy group, three days a week, from June 2012 to March 2013. She also continued to work part time in the litigation department. Avetisyan received positive feedback on her work in the secondment, and in September 2012 lawyers in the firm's data privacy department offered Avetisyan a position. At some point the client Avetisyan worked with also offered Avetisyan a full-time position, but Avetisyan declined the offer.

---

[1] As explained in Avetisyan's prior appeal, a "secondment" is an assignment of an individual from one company or firm to another for a defined period of time. (*Presbyterian Church of Sudan v. Talisman Energy, Inc.* (S.D.N.Y. 2006) 453 F.Supp.2d 633, 649; see *Avetisyan v. McTigue* (Mar. 27, 2018, B275931) [nonpub. opn.].)

3

Drinker Biddle gave Avetisyan a performance review in November 2012, nine months after she started working at the firm. Eisenberg, Davis, and Caplan—the partners Avetisyan worked with in the litigation department—each said Avetisyan needed to improve her legal research, analysis, or writing, or all three. Eisenberg and Davis also expressed concern about Avetisyan's efficiency. Avetisyan considered the reviews "inaccurate and unfair" and expressed her dissatisfaction with the reviews.

Meanwhile, Stanley Crosley, an attorney in the data privacy group who worked with Avetisyan as part of the secondment, gave her a positive review. Crosley stated Avetisyan brought "very strong technical skills" and "performed extremely well." Peter Blenkinsop, who also worked with Avetisyan as part of the secondment, stated he was "extremely impressed" with her.[2]

On March 21, 2013, shortly before Avetisyan finished her secondment, Avetisyan spoke with Eisenberg. Eisenberg told her things were not "working out" for her in the litigation department, and he encouraged her to work with the attorneys in the data privacy group if they had work for her. According to Avetisyan, Eisenberg told her that, if she insisted on working in the litigation department full time, Drinker Biddle would give her two to three months to look for a new job, which was consistent with the firm's typical practice.

---

[2]     Another reviewer, who apparently did not work with Avetisyan as part of the secondment, stated he was "very pleased" with Avetisyan's work and had "no significant criticisms."

Six days later, on March 27, 2013, Drinker Biddle gave Avetisyan an interim review. This time, only Crosley, Eisenberg, and one other attorney provided a review of Avetisyan's work. The reviews by Crosley and Eisenberg were similar to their November 2012 reviews: Crosley stated Avetisyan had exceeded the expectations of Drinker Biddle's client during the secondment and "created a tremendous amount of goodwill," while Eisenberg said the work she did for him "underscored existing concerns about whether she has the top flight analytical skills that are necessary to succeed" in the litigation department.[3]

The next day, Avetisyan met with Eisenberg and Wilson Brown, who at the time was the chair of the firm's litigation department. Brown's message was less bleak than Eisenberg's prior statements. He stated that Drinker Biddle wanted her to succeed at the firm, did not want her to look for a new job, and wanted her to focus on a large matter in the litigation department. According to Avetisyan, Brown made various promises to her about her employment, including that Drinker Biddle would continue to employ her as long she "performed as an average associate"; that Drinker Biddle would give her a "fair" chance to succeed; and that, if the firm terminated her employment, Drinker Biddle would give her "plenty of time" to find a new job. Avetisyan finished her secondment on March 29, 2013 and returned to the litigation department full time.

---

[3] The other reviewer provided a positive review, but had only "limited experience" working with Avetisyan on a client presentation.

5

B.   *Drinker Biddle Terminates Avetisyan's Employment, and Avetisyan Searches for a New Job*

Apparently dissatisfied with her employment situation (or perhaps seeing the writing on the firm wall), Avetisyan by July 8, 2013 had decided to leave Drinker Biddle and she applied to work at three other law firms.  In August 2013 she inquired about employment at two other firms.  On August 22, 2013 Eisenberg and Michael McTigue, the new chair of Drinker Biddle's litigation department, met with Avetisyan.  McTigue informed Avetisyan that Drinker Biddle wanted her to find a new job before the end of the year (2013) and that she no longer needed to come into the office.[4]  On December 16, 2013 McTigue sent an email to Avetisyan confirming that Drinker Biddle would terminate her employment on December 31, 2013, which it did.

Between August 22, 2013 and December 31, 2013 Avetisyan interviewed with at least one law firm and applied to at least three others, but did not receive an offer.  In 2014, after Drinker Biddle had terminated her employment, Avetisyan interviewed with several law firms.  In March 2014 she received an employment offer from one firm, but did not accept it, in part because her salary would have been lower than her salary at Drinker Biddle.  After failing to secure a position she deemed suitable, Avetisyan commenced a solo practice on July 14, 2014.

---

[4]   Drinker Biddle contends McTigue informed Avetisyan that the firm was terminating her employment effective December 31.  Avetisyan contends McTigue stated Drinker Biddle did not institute a "deadline" and was willing to give her additional time, if necessary, to find a new job.

C.     *Avetisyan Sues Drinker Biddle*

On July 16, 2014 Avetisyan filed this action against Drinker Biddle and several of its partners.  As relevant to this appeal, Avetisyan asserted causes of action against Drinker Biddle for breach of written, oral, and implied contract; promissory estoppel; breach of the implied covenant of good faith and fair dealing; deceit (i.e., fraud); and negligent misrepresentation.

D.     *The Trial Court Sustains Drinker Biddle's Demurrer to Most of Avetisyan's Causes of Action*

Drinker Biddle demurred to Avetisyan's causes of action for breach of written contract, breach of implied contract, and breach of the implied covenant of good faith and fair dealing, but not to her causes of action for breach of oral contract, promissory estoppel, fraud, or negligent misrepresentation.  The trial court sustained the demurrer with leave to amend, and in August 2015 Avetisyan filed a first amended complaint, asserting the same causes of action.  Drinker Biddle demurred again, this time not only to the causes of action it challenged in its first demurrer, but also to Avetisyan's causes of action for breach of oral contract and promissory estoppel.  In May 2016 the trial court sustained the demurrer, this time without leave to amend.[5]  Avetisyan filed an amended (the operative) complaint, asserting only the two causes of action Drinker Biddle had not challenged on demurrer: fraud and negligent misrepresentation.

---

[5]     Drinker Biddle demurred to nine other causes of action in Avetisyan's first amended complaint.  Avetisyan does not challenge the trial court's order sustaining Drinker Biddle's demurrer to these causes of action.

7

E.   *The Trial Court Grants Drinker Biddle's Motion for Summary Adjudication on Avetisyan's Remaining Causes of Action*

In January 2018 Drinker Biddle filed a motion for summary adjudication on each of the two remaining causes of action. Drinker Biddle argued Avetisyan could not establish the elements of her fraud or negligent misrepresentation causes of action because they were based on Drinker Biddle's alleged promises during her employment, including Brown's promise that Drinker Biddle would employ Avetisyan if her performance was average, each of which was either a nonactionable opinion or too vague and indefinite to give rise to liability. With respect to Brown's alleged promise, Drinker Biddle argued Avetisyan could not establish that Brown had the requisite fraudulent intent when he made the promise or that she reasonably relied on the promise.

The trial court granted Drinker Biddle's motion, ruling Avetisyan could not establish any "misrepresentations of fact" or "reliance upon those facts." The court entered judgment in favor of Drinker Biddle, and Avetisyan timely appealed.

## DISCUSSION

A.   *The Trial Court Erred in Sustaining the Demurrer to One of Avetisyan's Three Contract Causes of Action and to Her Promissory Estoppel Cause of Action*

1.   *Standard of Review*

"In reviewing an order sustaining a demurrer, we examine the operative complaint de novo to determine whether it alleges

8

facts sufficient to state a cause of action under any legal theory." (*T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 162; accord, *Ko v. Maxim Healthcare Services, Inc.* (2020) 58 Cal.App.5th 1144, 1149.) "In making this determination, we must accept the facts pleaded as true and give the complaint a reasonable interpretation." (*Mathews v. Becerra* (2019) 8 Cal.5th 756, 762; accord, *Ko*, at p. 1150.)

### 2.     *Breach of Contract*

"'A cause of action for breach of contract requires pleading of a contract, plaintiff's performance or excuse for failure to perform, defendant's breach and damage to plaintiff resulting therefrom.'" (*Crossroads Investors, L.P. v. Federal National Mortgage Assn.* (2017) 13 Cal.App.5th 757, 792; see *Coles v. Glaser* (2016) 2 Cal.App.5th 384, 391.)  Avetisyan alleged three different contract-based causes of action: breach of oral contract, breach of written contract, and breach of implied contract.  We conclude the trial court erred in sustaining the demurrer to the cause of action for breach of oral contract, but did not err in sustaining the demurrer to the causes of action for breach of written contract and breach of implied contract.

### a.     *The Trial Court Erred in Sustaining the Demurrer to Avetisyan's Cause of Action for Breach of Oral Contract*

Avetisyan alleges several theories in support of her cause of action for breach of oral contract, including that Brown promised Drinker Biddle would continue to employ her if she performed as an "average" associate.  Drinker Biddle argues this alleged promise was too vague and indefinite to enforce.

9

"'In order for acceptance of a proposal to result in the formation of a contract, the proposal "must be sufficiently definite, or must call for such definite terms in the acceptance, that the performance promised is reasonably certain." . . . If, by contrast, a supposed "contract" does not provide a basis for determining what obligations the parties have agreed to, and hence does not make possible a determination of whether those agreed obligations have been breached, there is no contract.'" (*Bowers v. Raymond J. Lucia Companies, Inc.* (2012) 206 Cal.App.4th 724, 734; see *Garcia v. World Savings, FSB* (2010) 183 Cal.App.4th 1031, 1045.) "'Whether a contract is certain enough to be enforced is a question of law for the court.'" (*Bowers*, at p. 734.)

A promise to continue employment so long as the employee's performance is "average" or the employee performs as an "average associate," like an offer to provide "appropriate" salary increases and bonuses, is a little vague. (See *Rochlis v. Walt Disney Co.* (1993) 19 Cal.App.4th 201, 213-214 [employer's promises to give an employee increases and bonuses "appropriate to his responsibilities and performance," and to provide "'active and meaningful' participation in creative decisions," were too vague and indefinite to enforce], disapproved on another ground in *Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1251.) A factfinder may have difficulty determining whether the employee's performance was "average." But this potential uncertainty is not fatal to Avetisyan's claim. The ""'law does not favor but leans against the destruction of contracts because of uncertainty; and it will, if feasible, so construe agreements as to carry into effect the reasonable intentions of the parties if [they] can be ascertained.""" (*Patel v. Liebermensch* (2008) 45 Cal.4th

344, 349; see *California Lettuce Growers v. Union Sugar Co.* (1955) 45 Cal.2d 474, 481.)

Avetisyan alleged facts from which the court could ascertain the parties' shared intentions and understanding of what average meant. Avetisyan alleged Drinker Biddle annually reviewed the performance of its associates, which suggested Drinker Biddle had some kind of indicators or metrics to evaluate and compare the performance of its associates. Avetisyan also alleged Brown made his promise, that the firm would continue to employ her as along as she did average work, during a meeting to discuss Avetisyan's interim performance review, where the attorneys Avetisyan worked with gave her feedback on her work and identified areas where her work was acceptable and where it was deficient. At the very least, a reasonable interpretation of Brown's alleged promise is that Drinker Biddle would continue to employ her if her deficiencies improved (and her strengths remained constant) compared to those of other associates at the firm. (See *Serafin v. Balco Properties Ltd., LLC* (2015) 235 Cal.App.4th 165, 173 ["'[m]utual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts'"].)

Moreover, Avetisyan alleged that Drinker Biddle used specific indicators to measure the performance of its associates and that the firm communicated those indicators to Avetisyan. Eisenberg stated in Avetisyan's interim review that Avetisyan continued to "display analytical issues" and failed to "obtain[ ] detailed feedback from the partners on the litigation team." In Avetisyan's previous review, Eisenberg, Caplan, and Davis all stated Avetisyan needed to improve her legal research, analysis,

11

or writing, and Eisenberg and Davis expressed concern with Avetisyan's efficiency. Again, a reasonable interpretation of Brown's promise was that these were the areas of performance Drinker Biddle would assess and that Drinker Biddle would continue to employ Avetisyan if her performance was similar to or better than the performance of other associates in these areas.

It is possible the Drinker Biddle partners' subjective judgment played a role in assessing whether Avetisyan's performance was average. But even if that were the case, Brown's alleged promise was not too vague or indefinite to create an enforceable agreement. For example, an employer and employee may agree the employer will not terminate the employee so long as the employee performs to the "satisfaction" of the employer. (*Pugh v. See's Candies, Inc.* (1988) 203 Cal.App.3d 743, 766, disapproved on another ground in *Guz v. Bechtel Nat., Inc.* (2000) 24 Cal.4th 317, 351 (*Guz*); see *Guz*, at p. 365 ["the employer and employee may enter '"an agreement . . . that . . . the employment relationship will continue indefinitely, pending the occurrence of *some event such as* the employer's dissatisfaction with the employee's services"'"].) That the employer's "satisfaction" depends on "fancy, taste, or judgment" does not mean the contract is too vague or indefinite to enforce. (*Pugh*, at p. 766.) If an employer and employee can agree the employer will only terminate the employee if the employee's performance is not "satisfactory" to the employer, there is no reason they cannot also agree the employer will only terminate the employee if the employee's performance is below "average."[6]

---

[6] Because Drinker Biddle did not show Avetisyan failed to state a cause of action for breach of oral contract, we do not

12

b. *The Trial Court Did Not Err in Sustaining the Demurrer to the Cause of Action for Breach of Written Contract*

In support of her cause of action for breach of written contract, Avetisyan alleged Drinker Biddle breached written agreements not to terminate her without good cause and to provide her annual performance reviews. Avetisyan did not allege sufficient facts to constitute a cause of action under either theory.

i. *Avetisyan Did Not Plead Facts Sufficient To Show a Written Agreement Drinker Biddle Would Not Terminate Her Without Good Cause*

Avetisyan argues Drinker Biddle breached "an implied term" in its offer letter "not to terminate [her] employment without just cause." Her allegations did not state facts to constitute a cause of action. Labor Code section 2922, which provides that "[a]n employment, having no specified term, may be terminated at the will of either party on notice to the other," creates a "strong" presumption an employment is at-will. (*Guz, supra,* 24 Cal.4th at p. 336.) "[T]he employer may act peremptorily, arbitrarily, or inconsistently, without providing specific protections such as prior warning, fair procedures, objective evaluation, or preferential reassignment." (*Id.* at p. 350;

---

address Avetisyan's other allegations and theories supporting that cause of action. (See *Daniels v. Select Portfolio Servicing, Inc.* (2016) 246 Cal.App.4th 1150, 1169 ["Ordinarily, a general demurrer may not be sustained . . . to a portion of a cause of action."].)

accord, *Nakai v. Friendship House Assn. of American Indians, Inc.* (2017) 15 Cal.App.5th 32, 42.)

Drinker Biddle did not state in its offer letter, which Avetisyan attached to her complaint, that Avetisyan's employment would be for a specified term, nor did the letter specify the terms under which Drinker Biddle could terminate her employment. Therefore, under Labor Code section 2922, there is a strong presumption Drinker Biddle hired Avetisyan as an at-will employee.

An employer and employee may agree "to any limitation, otherwise lawful, on the employer's termination rights," including a limitation on an employer's right to terminate an employee only for "'good cause.'" (*Guz, supra,* 24 Cal.4th at p. 336.) "'Good cause' . . . is defined as: 'fair and honest reasons, regulated by good faith on the part of the employer, that are not trivial, arbitrary or capricious, unrelated to business needs or goals, or pretextual.'" (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 872; see *Guz,* at p. 336.) But the employee has the burden to plead facts sufficient to overcome the presumption he or she was at-will. (See *Popescu v. Apple Inc.* (2016) 1 Cal.App.5th 39, 59 ["conclusory allegations [are] insufficient to support a claim based upon an alleged employment contract under which the plaintiff may be terminated only for good cause"], disapproved on another ground in *Ixchel Pharma, LLC v. Biogen, Inc.* (2020) 9 Cal.5th 1130, 1148; *Haycock v. Hughes Aircraft Co.* (1994) 22 Cal.App.4th 1473, 1489 ["Because the presumption of at-will employment is premised upon public policy considerations, it is one affecting the burden of proof."].)

Drinker Biddle's offer letter stated: "At [Drinker Biddle] associates are evaluated at least annually, with an extensive

14

review during the autumn.  Associate compensation is adjusted annually also on the basis of the associate's development, the demand for his or her services, and market factors.  Associates advance through Levels based on their performance and a consideration of the firm's and Practice Group's needs.  [¶]  [F]or FY2012 you will be eligible for discretionary bonuses based on performance, billable hours, and other matters relevant to the evaluation of associates . . . .  Associates are also eligible for a business development bonus."

Avetisyan contends Drinker Biddle's compensation, review, and advancement policies created an implied term in the written offer of employment that Drinker Biddle would not terminate her employment except for just cause.  They did not.  While relevant, an employer's offer to evaluate employees and provide performance incentives like raises, bonuses, and promotions, without more, does not overcome the presumption of an at-will employment agreement.  (See *Guz*, *supra*, 24 Cal.4th at p. 342 ["[a]bsent other evidence of the employer's intent, longevity, raises and promotions are their own rewards for the employee's continuing valued service; they do not, *in and of themselves*, additionally constitute a contractual guarantee of future employment security"]; *Kelly v. Stamps.com Inc.* (2005) 135 Cal.App.4th 1088, 1102-1103 [an employer's promise of a two-stage bonus did not create an implied agreement the employer would not terminate an employee until the second-stage payment was due]; *Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, 969-970 [an employment term that a performance review would "'be completed after (12) months of employment'" did not establish an implied minimum, one-year contract term]; *Rochlis v. Walt Disney Co.*, *supra*, 19 Cal.App.4th

15

at pp. 213-214 [promises that an employee would receive salary increases and bonuses "appropriate to his responsibilities and performance" did not overcome an at-will employment agreement].)

> ii. *Avetisyan Did Not Plead Facts Sufficient To Show Drinker Biddle Breached Its Agreement To Provide Performance Reviews*

As discussed, Drinker Biddle's offer letter stated the firm would review Avetisyan at least annually, including an "extensive review" in the fall. Avetisyan contends Drinker Biddle breached this term by not giving her an annual performance review in the fall of 2013, even though she was still employed. Drinker Biddle argues that it complied with this term because it gave Avetisyan reviews in the fall of 2012 and spring of 2013, identifying the areas of her performance the firm found deficient, and that the firm had no obligation to provide an additional review in the fall of 2013 after it notified Avetisyan in August 2013 it intended to terminate her employment.

Drinker Biddle has the better argument. Drinker Biddle significantly changed the nature of the employment agreement in August 2013 after the meeting between McTigue and Avetisyan. (See *Schachter v. Citigroup, Inc.* (2009) 47 Cal.4th 610, 619 ["it is settled that an employer may unilaterally alter the terms of an employment agreement, provided such alteration does not run afoul of the Labor Code"].) In addition to telling Avetisyan that she should find a new job by the end of the year, McTigue instructed Avetisyan to "transition[ ] her work." Under this revised employment arrangement, Avetisyan would no longer

16

perform the work Drinker Biddle had hired and expected her to do, and Drinker Biddle would pay Avetisyan until either she found a new job or the end of the year. Avetisyan accepted this new arrangement by continuing the employment (and accepting her compensation). (See *Schachter,* at p. 620 ["An 'employee who continues in the employ of the employer after the employer has given notice of changed terms or conditions of employment has accepted the changed terms and conditions.'"]; *Asmus v. Pacific Bell* (2000) 23 Cal.4th 1, 15 ["Just as employers must accept the employees' continued employment as consideration for the original contract terms, employees must be bound by amendments to those terms, with the availability of continuing employment serving as adequate consideration from the employer."].)

Under these circumstances, Drinker Biddle's promise when it hired Avetisyan to give her an annual review each fall did not survive the new arrangement. Avetisyan was not doing any new work for Drinker Biddle; there was nothing to review, and no point to reviewing the work of an associate who was not working and not going to remain at the firm. The primary purpose of the annual review, according to the offer letter, was to inform associates of the firm's advancement and compensation decisions, and Avetisyan was not going to advance or receive compensation for much longer.[7]

---

[7] Avetisyan also contends, without any analysis or further explanation, that Drinker Biddle breached this term by providing "earlier incomplete and/or false evaluations." We treat this contention as forfeited. (See *Potter v. Alliance United Ins. Co.* (2019) 37 Cal.App.5th 894, 911.)

17

c. *The Trial Court Did Not Err in Sustaining the Demurrer to the Cause of Action for Breach of Implied Contract*

"An implied contract is one, the existence and terms of which are manifested by conduct." (Civ. Code, § 1621.) "Although an implied in fact contract may be inferred from the 'conduct, situation or mutual relation of the parties, the very heart of this kind of agreement is an intent to promise,'" and like an express contract, an implied contract ""'must be founded upon an ascertained agreement of the parties to perform it.'""" (*Friedman v. Friedman* (1993) 20 Cal.App.4th 876, 887; see *Unilab Corp. v. Angeles-IPA* (2016) 244 Cal.App.4th 622, 636.) To plead a cause of action for breach of implied contract, "the facts from which the promise is implied must be alleged." (*Youngman v. Nevada Irrigation Dist.* (1969) 70 Cal.2d 240, 247; accord, *Requa v. Regents of University of California* (2012) 213 Cal.App.4th 213, 228.)

In support of her cause of action for breach of implied contract, Avetisyan alleged Drinker Biddle breached implied agreements not to terminate her without good cause and to give her at least six months' notice in the event it terminated her. Again, neither allegation was sufficient to constitute a cause of action.

i. *Avetisyan Did Not Plead Facts Sufficient To Show an Implied Agreement Not To Terminate Her Employment Without Good Cause*

Avetisyan contends that, even if Drinker Biddle's offer letter did not contain an implied term that Drinker Biddle would

18

not terminate her employment without good cause, Drinker Biddle's conduct during the course of her employment created an implied agreement Drinker Biddle would not terminate her employment without good cause (in addition to the oral agreement that Drinker Biddle would continue to employ her if she did average work). As discussed, an employer and employee may agree to limit the employer's right to terminate an employee only for good cause. (See *Guz*, *supra*, 24 Cal.4th at p. 336.) Such an agreement "may be implied in fact*,* arising from the parties' conduct evidencing their actual mutual intent to create such enforceable limitations." (*Ibid*.) Factors "that may bear upon 'the existence and content of an . . . [implied-in-fact] agreement' placing limits on the employer's right to discharge an employee . . . might include '"the personnel policies or practices of the employer, the employee's longevity of service, actions or communications by the employer reflecting assurances of continued employment, and the practices of the industry in which the employee is engaged."'" (*Id*. at pp. 336-337.) The employee has the burden to plead facts sufficient to show an implied-in-fact agreement to overcome the presumption the employee was at-will. (See *Gould v. Maryland Sound Industries, Inc.* (1995) 31 Cal.App.4th 1137, 1151 ["To state a cause of action . . . the plaintiff must plead facts which, if proved, may be sufficient for a jury to find an implied-in-fact contract limiting the defendant's right to discharge the plaintiff without cause."]; see also *Popescu v. Apple Inc.*, *supra*, 1 Cal.App.5th at p. 59; cf. *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 682 (*Foley*) [reversing an order sustaining a demurrer because the employee "pleaded facts which, if proved, may be sufficient for a jury to find an implied-in-fact contract limiting defendant's right to discharge him

19

arbitrarily—facts sufficient to overcome the presumption of Labor Code section 2922"].)

In addition to Drinker Biddle's offer to provide performance incentives, Avetisyan points to her year-and-a-half term of employment at the firm, the allegedly positive feedback she received for her work in the secondment, Brown's alleged promises during his March 2013 meeting with Avetisyan, and positive feedback she allegedly received for her litigation work after the meeting. Long-term employment, combined with an employer's repeated assurances of job security, can create an implied agreement the employer will not terminate an employee without good cause. (See *Stillwell v. The Salvation Army* (2008) 167 Cal.App.4th 360, 365, 381-382 [substantial evidence supported the jury's finding there was an implied agreement where the employee "presented considerable evidence that [the employer's] managers had made repeated 'assurances of continued employment'" during the plaintiff's 30-year employment]; *Pugh v. See's Candies, Inc., supra*, 116 Cal.App.3d at pp. 316-318, 329 [employee made a prima facie showing of an implied-in-fact agreement where he worked for the employer for 32 years, received multiple promotions, and received no work criticism, and where the company had a policy of not terminating employees without good cause].) On the other hand, isolated assurances of job security, even when coupled with long-term employment, are generally not sufficient to create an implied agreement. (See *Carter v. CB Richard Ellis, Inc.* (2004) 122 Cal.App.4th 1313, 1327-1328 [no implied agreement where the employee worked with a company for 30 years and the employer stated during the employee's initial interview that, "'as long as [she] did a good job and performed [her] responsibilities,

20

[she] would continue to advance with the company'"]; *Gould v. Maryland Sound Industries, Inc.*, *supra*, 31 Cal.App.4th at pp. 1151-1152 [no implied agreement where the employee worked for a company for three years and a supervisor told him that employees who complete a 90-day probationary period become "members" of the company and that the company was looking for "long-term" employees]; *Miller v. Pepsi-Cola Bottling Co.* (1989) 210 Cal.App.3d 1554, 1559 [no implied agreement where the employee worked a company for 11 years, and his employer told him he would "'have a job for the rest of your life, as long as you do your job'"].)

One problem for Avetisyan is that, as she admitted in her complaint, she did not receive repeated assurances of job security. Most importantly, before Brown allegedly stated Drinker Biddle would give Avetisyan a fair chance to succeed and continue to employ her as long as her work was average, Eisenberg had told Avetisyan that her employment was *not* secure. He stated that litigation was not "working out" for her and that Drinker Biddle would likely terminate her employment in two or three months if she insisted on working in the litigation department. Avetisyan also admitted that her impression after her conversation with Eisenberg was that she could "join [the] data privacy [group] or leave." And she admitted that, in her only two formal performance reviews, Eisenberg, Davis, and Caplan all stated she needed to improve. Davis described Avetisyan's work as "very mediocre" and said he was concerned about her "inefficiency," and Eisenberg said she "failed to show the analytical heft and research skills necessary to perform the . . . work that we do at [Drinker Biddle]." (Cf. *Stillwell v. The Salvation Army*, *supra*, 167 Cal.App.4th at pp. 382-383 [employee

21

received positive performance reviews, commendations, and salary increases during a "long and distinguished career" at a company]; *Pugh v. See's Candies, Inc.*, *supra*, 116 Cal.App.3d at p. 317 [employer frequently indicated the employee's job was secure, while making "no formal or written criticism of [the employee's] work"].)

Avetisyan also did not allege she received any promotions or salary increases during her employment, and she admitted Drinker Biddle did not give her a discretionary bonus. (Cf. *Pugh v. See's Candies, Inc.*, *supra*, 116 Cal.App.3d at p. 318 [employee "was never denied a . . . bonus"].) And although Avetisyan alleged she received some positive feedback, particularly on her work during the secondment, positive feedback is a "'natural occurrence[ ] of an employee who remains with an employer for a substantial length of time'" (*Kovatch v. California Casualty Management Co.* (1998) 65 Cal.App.4th 1256, 1276, disapproved on another ground in *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853, fn. 19; accord, *Miller v. Pepsi-Cola Bottling Co.*, *supra*, 210 Cal.App.3d at p. 1559) and is not enough, without more, to overcome the presumption of at-will employment. (See *Guz*, *supra*, 24 Cal.4th at pp. 341-342 ["employee's *mere* passage of time in the employer's service, even where marked with tangible indicia that the employer approves the employee's work, cannot *alone* form an implied-in-fact contract that the employee is no longer at will"]; *Kovatch*, at p. 1276 [evidence of "positive performance reviews, commendations, salary increases, and vague assurances that [the employee] would become a sales manager [were] not sufficient to create a triable issue of fact" regarding whether the parties had an implied agreement limiting the employer's right to terminate the employee]; see also *Guz,* at

22

p. 337 [not "every vague combination of *Foley* factors, shaken together in a bag, necessarily allows a finding that the employee had a right to be discharged only for good cause"].) This is particularly true for Avetisyan, whose reviews were, at best, mixed.

Brown may have promised during his March 2013 meeting with Avetisyan that Drinker Biddle would continue to employ her if she performed as an average associate, and therefore offered a specific term limiting Drinker Biddle's termination rights (which Avetisyan accepted). But an oral agreement to employ someone if he or she performs as an average employee is not the same as an implied agreement not to terminate except for good cause, even though both kinds of agreements may restrict the employer's rights to terminate the employment. A factfinder may only find an implied agreement to such an arrangement if "the employer's words or conduct, on which an employee reasonably relied, gave rise to that *specific* understanding." (See *Guz*, *supra*, 24 Cal.4th at p. 342.) Avetisyan did not plead facts showing Brown's alleged promise that Drinker Biddle would continue to employ her so long as she did average work gave rise to any other implied understanding between the parties.

> ii. *Avetisyan Did Not Plead Facts Sufficient To Show an Implied Agreement Drinker Biddle Would Provide Her Six Months' Notice*

Avetisyan next argues Brown's promise that Drinker Biddle would give her "plenty of time" to find a new job created an implied agreement that Drinker Biddle would give her at least six months' notice before terminating her employment. Even

23

where an employment agreement is at-will, an employer may still breach an implied agreement "to follow certain procedural policies in the termination process." (*Guz*, *supra*, 24 Cal.4th at p. 348.)

But even if Brown's promise that the firm would give Avetisyan "plenty of time" was sufficiently definite to be enforceable, Avetisyan did not plead sufficient facts to show Brown meant at least six months when he used the phrase, rather than the four months Drinker Biddle provided her. Avetisyan alleged "Brown understood that [Drinker Biddle] would provide [her] at least up to six months to secure new employment." This conclusory allegation about what Brown understood was insufficient to show an implied contract. (See *Poseidon Development, Inc. v. Woodland Lane Estates, LLC* (2007) 152 Cal.App.4th 1106, 1114 ["The allegation of the parties' intent" regarding a contract "is a conclusion of fact, which need not be accepted for purposes of demurrer."].)

Nor did Avetisyan's other allegations suggest Brown intended to guarantee her six months' notice in the event Drinker Biddle terminated her employment. According to Avetisyan, Eisenberg told her Drinker Biddle's "typical course" was to provide associates "two to three months," not six months, to find a new position. She did not allege that any other person from Drinker Biddle told her the firm would give her more time or that Drinker Biddle had ever provided any other associate or employee six months' notice. (See *Guz*, *supra*, 24 Cal.4th at p. 336 [""practices of the employer"" are relevant to an implied-in-fact agreement]; *Foley*, *supra*, 47 Cal.3d at p. 680 [same].) Avetisyan also alleged Brown "knew that most firms typically provide two to six months for associates to seek new

24

employment."  While industry standards are relevant to an implied agreement (see *Guz*, at pp. 336-337), Avetisyan did not allege she and Brown discussed other law firms' termination practices, and Drinker Biddle's decision to provide Avetisyan more than four (but less than six) months was within this range. Avetisyan did not allege any facts suggesting Brown, by saying "plenty of time," was referring to the high end of the industry standard—particularly given Eisenberg's prior statement that Drinker Biddle typically provided associates only two to three months.[8]

### 3. *Promissory Estoppel*

"[U]nder the doctrine of promissory estoppel, '[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.'" (*Kajima/Ray Wilson v. Los Angeles County Metropolitan Transportation Authority* (2000) 23 Cal.4th 305, 310; accord, *Flintco Pacific, Inc. v. TEC Management Consultants, Inc.* (2016)

---

[8] Avetisyan also alleged that other Drinker Biddle partners exchanged emails several months after Brown's alleged promise that "confirmed [the firm's] intention to provide Avetisyan '6 months' to secure new employment."  But Avetisyan did not describe the contents of the emails or explain how they "confirmed" what Brown or Drinker Biddle intended during Brown's discussion with Avetisyan several months earlier.  And she did not allege facts showing Brown conveyed the firm's alleged intent to her.  (See *Guz*, *supra*, 24 Cal.4th at p. 337 [an implied agreement is demonstrated by the "parties' conduct evidencing a similar meeting of minds"].)

1 Cal.App.5th 727, 733.) "The purpose of this doctrine is to make a promise binding, under certain circumstances, without consideration in the usual sense of something bargained for and given in exchange." (*Youngman v. Nevada Irrigation Dist.*, *supra*, 70 Cal.2d at p. 249; see *Douglas E. Barnhart, Inc. v. CMC Fabricators, Inc.* (2012) 211 Cal.App.4th 230, 242.) Thus, "'*promissory estoppel is distinct from contract* in that the promisee's justifiable and detrimental reliance on the promise is regarded as a substitute for the consideration required as an element of an enforceable contract.'" (*Douglas E. Barnhart, Inc.*, at p. 242; see *Newport Harbor Ventures, LLC v. Morris Cerullo World Evangelism* (2016) 6 Cal.App.5th 1207, 1224.)

Avetisyan's promissory estoppel cause of action was based on the same alleged promises by Drinker Biddle on which she based her cause of action for breach of oral contract. In the trial court, Drinker Biddle only argued that, because each of Drinker Biddle's alleged promises to Avetisyan were too vague and indefinite to create enforceable contracts, they were not sufficiently "clear and unambiguous" to create enforceable promises for purposes of promissory estoppel. (See *Flintco Pacific, Inc. v. TEC Management Consultants, Inc.*, *supra*, 1 Cal.App.5th at p. 734 [to state a cause of action for promissory estoppel, the plaintiff must plead, among other things, "'"a promise clear and unambiguous in its terms"'"].) As discussed, Drinker Biddle is incorrect. Therefore, the trial court erred in sustaining the demurrer to Avetisyan's cause of action for promissory estoppel.

26

### 4. *Breach of the Implied Covenant of Good Faith and Fair Dealing*

Avetisyan makes no effort to explain why the court erred in sustaining Drinker Biddle's demurrer to her cause of action for breach of the implied covenant of good faith and fair dealing. She states that the allegations in support of this cause of action "buttressed the contract claims," but she admits that the cause of action "was arguably superfluous in light of the . . . contract causes of action." Avetisyan has not shown the trial court erred in sustaining the demurrer to her cause of action for breach of the implied covenant of good faith and fair dealing. (See *Denny v. Arntz* (2020) 55 Cal.App.5th 914, 920 [even when "[o]ur review is de novo," the "appellant bears the burden of demonstrating error"]; *Morgan v. Imperial Irrigation Dist.* (2014) 223 Cal.App.4th 892, 913 [even where the de novo standard of review applies, """"review is limited to issues which have been adequately raised and briefed""""].)

### 5. *Leave To Amend*

"A trial court abuses its discretion by sustaining a demurrer without leave to amend where "'there is a reasonable possibility that the defect can be cured by amendment.'"" (*Ko v. Maxim Healthcare Services, Inc., supra*, 58 Cal.App.5th at p. 1150; see *City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 865.) "The plaintiff has the burden of proving that an amendment would cure the defect." (*Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 320; accord, *Ko*, at p. 1150; see *Association for Los Angeles Deputy Sheriffs v. County of Los Angeles* (2021) 60 Cal.App.5th 327, 335 ["Plaintiff has the

27

burden to show a reasonable possibility the complaint can be amended to state a cause of action."].)

Avetisyan argues the trial court should have granted her leave to amend because she "could have alleged further details" about Brown's statements during their March 2013 meeting, McTigue's statements during their August 2013 meeting when he advised her to seek other employment, and "the related circumstances and conduct of the parties." But she does not explain which details she would add or how additional allegations would cure the defects in her complaint. Therefore, she has failed to meet her burden of showing the trial court abused its discretion in sustaining Drinker Biddle's demurrer without leave to amend to her causes of action for breach of written contract, breach of implied contract, and breach of the implied covenant of good faith and fair dealing.

> ### B. *The Trial Court Erred in Granting Summary Adjudication on Avetisyan's Fraud Cause of Action and in Granting Summary Judgment*

> #### 1. *Standard of Review*

A court may grant a motion for summary adjudication when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c); see *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618.) A defendant moving for summary adjudication "'"bears the burden of showing the court that the plaintiff "has not established, and cannot reasonably expect to establish,"' the elements of his or her cause of action."'" (*Ennabe*

28

*v. Manosa* (2014) 58 Cal.4th 697, 705; accord, *Mattei v. Corporate Management Solutions, Inc.* (2020) 52 Cal.App.5th 116, 122.) When a defendant moves for summary adjudication on a cause of action for which the plaintiff has the burden of proof at trial, the defendant "must present evidence that either 'conclusively negate[s] an element of the plaintiff's cause of action' or 'show[s] that the plaintiff does not possess, and cannot reasonably obtain,' evidence necessary to establish at least one element of the cause of action. [Citation.] Only after the defendant carries that initial burden does the burden shift to the plaintiff 'to show that a triable issue of one or more material facts exists as to the cause of action . . . .'" (*Luebke v. Automobile Club of Southern California* (2020) 59 Cal.App.5th 694, 702-703; accord, *Mattei*, at p. 122; see Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co., supra*, 25 Cal.4th at pp. 853-854.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar*, at p. 850; accord, *Welborne v. Ryman-Carroll Foundation* (2018) 22 Cal.App.5th 719, 724.)

"We review a grant of summary [adjudication] de novo and decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law." (*Mattei v. Corporate Management Solutions, Inc., supra*, 52 Cal.App.5th at p. 122; see *Regents of University of California v. Superior Court, supra*, 4 Cal.5th at p. 618.) We "liberally constru[e] the evidence in favor of the party opposing the motion and resolv[e] all doubts about the evidence in favor of the opponent.'" (*Ghazarian v. Magellan Health, Inc.* (2020)

29

53 Cal.App.5th 171, 182; see *Regents of University of California*, at p. 618.)

2. *The Trial Court Erred in Granting Summary Adjudication on the Cause of Action for Fraud*

Avetisyan alleged several theories in support of her cause of action for fraud, including that Brown falsely promised to employ her if she performed at the level of an average associate. "'Promissory fraud' is a subspecies of the action for fraud . . . . A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud." (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638; accord, *Austin v. Medicis* (2018) 21 Cal.App.5th 577, 588; *Rossberg v. Bank of America, N.A.* (2013) 219 Cal.App.4th 1481, 1498.) To prevail on a cause of action for promissory fraud the plaintiff must show "'a promise made regarding a material fact,'" the "'existence of the intent not to perform at the time the promise was made,'" and "'nonperformance by the party making the promise.'" (*Gruber v. Gruber* (2020) 48 Cal.App.5th 529, 540; accord, *Rossberg*, at p. 1498.) The plaintiff must also show, as with any fraud claim, the defendant had the "'intent to defraud, i.e., to induce reliance,'" "'justifiable reliance,'" and "'resulting damage.'" (*Lazar*, at p. 638; accord, *Robinson Helicopter Co., Inc. v. Dana Corp.* (2004) 34 Cal.4th 979, 990; *Kumaraperu v. Feldsted* (2015) 237 Cal.App.4th 60, 70.)

With respect to Brown's purported promise the firm would continue to employ Avetisyan if she did average associate work, Drinker Biddle argued in its motion for summary adjudication that Avetisyan could not establish that Drinker Biddle made a(n

30

enforceable) promise, that the firm intended not to perform the alleged promise, or that she justifiably relied on the alleged promise. Drinker Biddle, however, did not show Avetisyan could not establish any of these elements.

### a.    *The Promise*

Drinker Biddle's first argument was that Brown's alleged promise was too vague and indefinite to create an enforceable promise. But because, as discussed, Brown's purported promise was not too vague or indefinite to support Avetisyan's cause of action for breach of oral contract, it was not too vague or indefinite to support her cause of action for promissory fraud. As the California Supreme Court explained in *Lazar v. Superior Court*, *supra*, 12 Cal.4th 631, an "action for promissory fraud may lie where a defendant fraudulently induces the plaintiff to enter into a contract. . . .  [If] the defendant's promise is ultimately enforceable as a contract," the plaintiff "'has a cause of action in tort as an alternative at least, and perhaps in some instances in addition to his cause of action on the contract.'"  (*Id.* at p. 638; see *Agosta v. Astor* (2004) 120 Cal.App.4th 596, 603.)

### b.    *Intent To Perform*

Drinker Biddle also argued that, even if Brown made the promise, Avetisyan could not prove he had no intention of performing it. To attempt to meet its burden on summary adjudication, Drinker Biddle only argued that Avetisyan "ha[d] no evidence of fraudulent intent." But it is not enough for a defendant, to meet its moving burden on summary adjudication, to "show that the plaintiff *does not possess* needed evidence"; "the defendant must also show that the plaintiff *cannot reasonably*

31

*obtain* needed evidence . . . ." (*Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at p. 854; accord, *Chavez v. Glock, Inc.* (2012) 207 Cal.App.4th 1283, 1302; see *Gaggero v. Yura* (2003) 108 Cal.App.4th 884, 891 ["[P]ointing out the absence of evidence to support a plaintiff's claim is insufficient . . . . The defendant must also produce evidence that the plaintiff cannot reasonably obtain evidence to support his or her claim."].) Drinker Biddle did not even argue, much less present evidence, Avetisyan could not reasonably obtain the evidence needed to establish Brown did not intend to keep his alleged promise. For this reason alone, Drinker Biddle failed to meet its burden. (See *Nazaretyan v. California Physicians' Service* (2010) 182 Cal.App.4th 1601, 1614 ["trial court erred by granting the [defendant's] motion for summary judgment" where the defendant "did not make or attempt to make such a showing—that . . . plaintiffs lack and cannot reasonably obtain evidence" necessary to establish their claims, and the record was "silent as to whether plaintiffs could reasonably obtain favorable evidence"].)

Worse, Drinker Biddle did not accurately characterize the "evidence" it asserted showed Avetisyan did not possess evidence needed to prove Drinker Biddle did not intend to perform the alleged promise. (See *Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at p. 854 ["[s]ummary judgment law in this state . . . continues to require a defendant moving for summary judgment to present evidence, and not simply point out that the plaintiff does not possess, and cannot reasonably obtain, needed evidence," for example, "through admissions by the plaintiff following extensive discovery"]; *Professional Collection Consultants v. Lauron* (2017) 8 Cal.App.5th 958, 965 [same].) Citing an excerpt from Avetisyan's deposition testimony, Drinker

32

Biddle claimed the "only evidence" of the firm's "purported fraudulent intent [was] that [Drinker Biddle] did not fulfill the alleged promises."

It is true that the "mere subsequent failure of performance," without more, is insufficient to show a promisor never intended to perform a promise. (*Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1183; see *Tenzer v. Superscope, Inc.* (1985) 39 Cal.3d 18, 30 ["'something more than nonperformance is required to prove the defendant's intent not to perform his promise'"].) But Avetisyan never said during her deposition that Drinker Biddle's failure to perform the promise was the "only" evidence the firm never intended to perform. When questioned by counsel for Drinker Biddle at her deposition about what evidence she possessed, she discussed several pieces of circumstantial evidence. (See *Riverisland Cold Storage,* at p. 1183 ["'fraudulent intent must often be established by circumstantial evidence'"]; *David v. Hermann* (2005) 129 Cal.App.4th 672, 686 ["proof of intent to deceive, '[f]rom the very nature of the inquiry . . . must necessarily be largely or wholly circumstantial'"].) For example, Avetisyan stated that, at the time Brown made the purported promise, Drinker Biddle had decided to gradually lay off associates because of the firm's "economic situation," but that Davis and Caplan had a specific case "at its heaviest period" they needed Avetisyan to work on before the firm could terminate her employment. She also stated that Tessa Raisin, another Drinker Biddle associate, told Avetisyan that she (Raisin) had suggested that Caplan and Davis continue to employ Avetisyan because she had worked on the case, rather than bring in a different Drinker Biddle associate to take over. And Avetisyan stated Drinker

33

Biddle produced documents showing the partners discussed terminating Avetisyan's employment "well in advance" of August 22, 2013, the date Drinker Biddle ultimately notified Avetisyan it was terminating her employment. (See *Locke v. Warner Bros., Inc.* (1997) 57 Cal.App.4th 354, 368 ["[f]raudulent intent . . . may be 'inferred from such circumstances as defendant's . . . failure even to attempt performance'"].) Drinker Biddle did not address any of this evidence or argue that the evidence, if Avetisyan possessed it, would still be insufficient to show Drinker Biddle never intended to perform Brown's alleged promise. Nor does Drinker Biddle do so on appeal. Instead, Drinker Biddle merely repeats its inaccurate characterization of Avetisyan's deposition testimony.

c. *Justifiable Reliance*

To prevail on a cause of action for promissory fraud, a plaintiff must prove both that "she actually relied" on the false promise (*Mirkin v. Wasserman* (1993) 5 Cal.4th 1082, 1088; accord, *OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.* (2007) 157 Cal.App.4th 835, 864) and that the reliance was "'"justifiable' . . ., i.e., circumstances were such to make it *reasonable* for [the] plaintiff to accept [the] defendant's statements without an independent inquiry or investigation."'" (*West v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 780, 794.) Drinker Biddle argued in the trial court, and argues on appeal, Avetisyan could not establish she actually relied on Brown's promise, that Drinker Biddle would continue to employ her if her performance was average, because Avetisyan admitted she talked to recruiters and reviewed job postings "as early as March 2013." Drinker Biddle relied in its motion on excerpts of Avetisyan's deposition testimony. But again, the testimony

34

Drinker Biddle submitted did not support its argument. Nowhere in the deposition testimony submitted by Drinker Biddle did Avetisyan state she had talked to recruiters or reviewed job postings by March 2013.[9]

Drinker Biddle also submitted evidence that in July 2013 Avetisyan sent applications to other law firms and told those firms she "plan[ned] to make a 'final' lateral move"—a fact Avetisyan did not dispute. While this may have been sufficient for Drinker Biddle to meet its initial burden on summary judgment to show Avetisyan was no longer relying on Brown's alleged promise by July, it does not show she did not rely on his promise between March, when Brown allegedly made the promise, and July, when she submitted the applications. Drinker Biddle contends "any such reliance was, *at best*, temporary and limited." Maybe so. But Drinker Biddle does not cite any authority suggesting that a plaintiff cannot prevail on a promissory fraud cause of action simply because the plaintiff relied only temporarily on the alleged promise, so long as the plaintiff's temporary reliance results in damages.

And even if Drinker Biddle met its initial burden to show Avetisyan did not actually or justifiably rely on Brown's alleged promise, Avetisyan created triable issues of material fact on both issues. Drinker Biddle contended any reliance on Brown's promise was not justifiable because Avetisyan admitted in her complaint that, one week before Brown made the promise,

---

[9] Avetisyan did state that at some point between March 21 and August 22 she had "some communication with recruiters" and considered other job opportunities, but she did not specify whether those communications were nearer to March 21 or August 22.

Eisenberg told Avetisyan that her future in litigation was not looking good and that the firm would probably terminate her employment if she insisted on working in the litigation department. Drinker Biddle also cited Avetisyan's deposition testimony admitting she had reason to distrust Drinker Biddle by the time Brown made the alleged promise. But in opposition to the motion, Avetisyan explained in her declaration that while she distrusted Caplan, Davis, and Eisenberg, the partners with whom she directly worked, she did not distrust Brown, the chair of the litigation group, or other Drinker Biddle partners. Drinker Biddle does not explain why Avetisyan could not have trusted Brown and justifiably relied on his assurances.

Avetisyan also explained in her declaration that, although she submitted some applications to law firms before August 22, 2013, she did not "conduct a diligent and thorough search for employment prior to" that date. She also submitted her deposition testimony to the same effect, as well as her deposition testimony that she did not begin looking for in-house positions until "at least a month or two after" Drinker Biddle informed her it was terminating her employment.

Eisenberg's statement that litigation was not looking good for Avetisyan, and Avetisyan's admission that she did not trust Caplan, Davis, and Eisenberg, may be favorable evidence for Drinker Biddle. But "[q]uestions of materiality and justifiable reliance constitute questions of fact which cannot be resolved on summary adjudication, unless, . . . 'the undisputed facts leave no room for a reasonable difference of opinion.'" (*West Shield Investigations & Sec. Consultants v. Superior Court* (2000) 82 Cal.App.4th 935, 957; see *Orozco v. WPV San Jose, LLC* (2019) 36 Cal.App.5th 375, 391 ["""Except in the rare case where the

36

undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact."'"].) There was room for a difference of opinion here. A factfinder could reasonably find, based on Avetisyan's explanation in her declaration, that she believed Brown, the chair of Drinker Biddle's litigation group, spoke on behalf of the firm, even if Brown's statements were inconsistent with Eisenberg's previous statements. A factfinder could reasonably find Avetisyan, given her limited interaction with Brown, had no reason to distrust him. And a factfinder could reasonably find that Avetisyan relied, at least temporarily, on Brown's promise and refrained from seeking other employment, even if she started submitting applications to other law firms a few months after her meeting with Brown. (See *Palm Springs Villas II Homeowners Assn., Inc. v. Parth* (2016) 248 Cal.App.4th 268, 278-279 ["'declarations of the party opposing summary judgment . . . are liberally construed to determine the existence of triable issues of fact'"]; *Barry v. Turek* (1990) 218 Cal.App.3d 1241, 1246 [in deciding whether the plaintiff has created a triable issue of fact, courts "construe liberally" the plaintiff's declarations].) It is up to the factfinder to determine whether Avetisyan's version of events is true.

        d.    *Damages*

Drinker Biddle argues on appeal that Avetisyan cannot establish any nonspeculative injuries arising from Brown's alleged promise. The problem for Drinker Biddle is it did not move for summary adjudication on this ground. Drinker Biddle's motion for summary adjudication included a section titled, "Avetisyan cannot establish that her purported reliance on any of

37

[Brown's] statements proximately caused her any injury." But in that section, Drinker Biddle addressed only Brown's alleged promise that Drinker Biddle would provide her six months' notice in the event it terminated her employment, not his alleged promise that Drinker Biddle would employ her so long as she performed as an average associate. Drinker Biddle did not meet its burden to show Avetisyan did not have and could not reasonably obtain evidence of her alleged damages.[10]

### 3. *The Trial Court Did Not Err in Granting Summary Adjudication on the Cause of Action for Negligent Misrepresentation*

"The tort of negligent misrepresentation" is "a species of the tort of deceit" that "does not require intent to defraud but only the assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true." (*Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1255; accord, *Borman v. Brown* (2021) 59 Cal.App.5th 1048, 1060.)

---

[10] Because Drinker Biddle "treated the [fraud] cause of action as a single claim and sought summary adjudication of the entirety of this claim" (*Rojas-Cifuentes v. Superior Court* (2020) 58 Cal.App.5th 1051, 1061), rather than seeking summary adjudication on distinct parts of the claim, we do not consider whether Avetisyan could prevail on her other theories of fraud. (See *id.* at p. 1058 ["a motion seeking summary adjudication of an entire cause of action may not be granted unless 'it completely disposes of [the] cause of action'"]; see also Code Civ. Proc., § 437c, subd. (f).) There is no suggestion in the record the parties filed a stipulation pursuant to Code of Civil Procedure section 437c, subdivision (t), for the court to hear a motion for summary adjudication of an issue that did not completely dispose of the fraud cause of action.

Avetisyan's cause of action for negligent misrepresentation is based on alleged promises made by Drinker Biddle before Avetisyan's secondment, as well as the alleged promises by Brown during their March 2013 meeting.

Drinker Biddle relies on *Tarmann v. State Farm Mut. Auto Ins. Co.* (1991) 2 Cal.App.4th 153, where a person involved in a car accident asserted a cause of action against her insurer for negligent misrepresentation on the ground that the insurer had failed to fulfill its promise to pay for the damage to the car. (See *id.* at pp. 156, 158.) In affirming an order sustaining the insurer's demurrer, the court in *Tarmann* held that "an action based on a false promise is simply a type of *intentional* misrepresentation, i.e., actual fraud," because a "'false promise is [only] actionable on the theory that a promise implies an intention to perform, that *intention to perform or not to perform* is a state of mind, and that misrepresentation of such a state of mind is a misrepresentation of *fact*.'" (See *id.* at pp. 158-159; see 5 Witkin, California Procedure (5th ed. 2008) Pleading, § 721.) The court in *Tarmann* "decline[d] to establish a new type of actionable deceit: the negligent false promise." (*Tarmann,* at p. 159.) We agree a plaintiff cannot maintain a negligent misrepresentation cause of action for an unfulfilled, "negligently" made promise. Therefore, the trial court did not err in granting summary adjudication on this purported cause of action.

Avetisyan contends her negligent misrepresentation cause of action is also based on Brown's negligent misrepresentation of a fact—namely, Brown represented to Avetisyan that he had obtained Caplan's and Davis's consent to give Avetisyan a fair chance to succeed in the litigation group, when Brown in fact had not obtained such consent from Caplan and Davis. Avetisyan did

not allege this theory in her complaint, however, and she did not seek leave to amend her complaint in opposition to the motion for summary adjudication. (See *Ignat v. Yum! Brands, Inc.* (2013) 214 Cal.App.4th 808, 820 ["In a motion for summary judgment, the complaint limits the issues. A plaintiff opposing such a motion cannot defeat it by proffering new, unpleaded theories or issues."]; *Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1258 ["The complaint limits the issues to be addressed at the motion for summary judgment. The rationale is clear: It is the allegations in the complaint to which the summary judgment motion must respond."].) Avetisyan cannot use this theory to defeat Drinker Biddle's motion for summary adjudication on the negligent misrepresentation cause of action.[11]

---

[11] In any event, had Avetisyan alleged this theory, it would fail. Avetisyan asserted her negligent misrepresentation cause of action against Drinker Biddle, not Brown individually. She now contends Drinker Biddle (through Brown) misrepresented that the firm obtained the consent of its partners (Caplan and Davis) to give her a fair chance to succeed. But Drinker Biddle is generally deemed to have knowledge of the intentions of its partners. (See Civ. Code, § 2332 ["As against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other."].) Therefore, whether it was Brown, Caplan, or Davis who did not have the requisite intent to fulfill the promise, Avetisyan's claim is still based on an alleged promise made by Drinker Biddle without intent to perform, i.e., promissory fraud.

C. *Avetisyan Has Not Shown the Trial Court Abused Its Discretion in Denying Her Motion To Compel*

Avetisyan argues the trial court abused its discretion in denying her motion to compel further responses to "more than one-hundred discovery requests" and ruling on Drinker Biddle's motion for summary judgment "without first hearing [Avetisyan's] motion to compel [Drinker Biddle's] further appearance for deposition and (further) responses to deposition questions." There was no abuse of discretion here.

"'[I]t is appellant's burden to affirmatively show error. [Citation.] To demonstrate error, appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error.'" (*Multani v. Witkin & Neal* (2013) 215 Cal.App.4th 1428, 1457; accord, *Menges v. Department of Transportation* (2020) 59 Cal.App.5th 13, 27.) In addition, where, as here, the appellant challenges the trial court's discovery order following judgment, the appellant "must show not only that the trial court erred, but also that the error was prejudicial." (*Lickter v. Lickter* (2010) 189 Cal.App.4th 712, 740; see *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800 [there is no "presumption of injury from error," and the "appellate court [must] examine the evidence to determine whether the error did in fact prejudice" the appellant].)

Avetisyan does not identify any of the discovery requests at issue in her motion to compel, nor does she explain the substance of her discovery. She does not identify which witnesses she sought to compel the deposition of or the written discovery she sought to compel further responses to. She does not cite relevant authority governing the trial court's purported errors in denying

41

and continuing her motions to compel.  By failing to adequately identify the issues or to provide meaningful legal analysis, she has forfeited any contention the trial court abused its discretion.  (See *People ex rel. Harris v. Aguayo* (2017) 11 Cal.App.5th 1150, 1172 ["'We need not address points in appellate briefs that are unsupported by adequate factual or legal analysis.'"].)

Nor has Avetisyan shown that, even if the trial court abused its discretion, it is reasonably probable the court would have denied Drinker Biddle's motion for summary judgment (or its motion for summary adjudication on her cause of action for negligent misrepresentation).  (See *MacQuiddy v. Mercedes-Benz USA, LLC* (2015) 233 Cal.App.4th 1036, 1045 ["we need not decide if the trial court's discovery rulings were an abuse of discretion because, even assuming they were, [the appellant] has failed to demonstrate it is reasonably probable the outcome of the trial would have been more favorable to him had the trial court granted his motion to compel"]; *Lickter v. Lickter*, *supra*, 189 Cal.App.4th at p. 740 ["to show prejudicial error in the denial of their motion to compel, [appellants] would have to persuade us that had the trial court compelled [the defendant] to answer the deposition questions . . . it is reasonably probable her answers would have constituted, or somehow led to, admissible evidence sufficient to raise a triable issue of fact"].)  Avetisyan contends that, had the trial court granted her motions to compel, she would have obtained additional evidence in support of her fraud cause of action.  But we are reversing the order granting Drinker Biddle's motion for summary adjudication on the fraud cause of action, and Avetisyan does not argue the trial court's orders on her discovery motions prejudiced her with respect to the negligent misrepresentation cause of action.

## DISPOSITION

The judgment is reversed.  The trial court is directed to vacate its order sustaining the demurrer by Drinker Biddle without leave to amend, and to enter a new order overruling the demurrer to Avetisyan's causes of action for breach of oral contract and promissory estoppel and sustaining the demurrer to her causes of action for breach of written contract, breach of implied contract, and breach of the implied covenant of good faith and fair dealing without leave to amend.  The trial court is also directed to vacate its order granting Drinker Biddle's motion for summary judgment and to enter a new order denying the motion for summary adjudication on the fraud cause of action, granting the motion for summary adjudication on the negligent misrepresentation cause of action, and denying the motion for summary judgment.  Avetisyan's request for a new trial judge is denied.  Avetisyan is to recover her costs on appeal.

SEGAL, J.

We concur:

PERLUSS, P. J.

FEUER, J.

43